**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CHRISTINA PRINCE, Personal Representative
of the Estate of DAVID M. PRINCE, JR.,
deceased,

       Plaintiff/Counter-Defendant,

vs.                                                                                          No. CIV 18-0899 JB\GBW

CITY OF DEMING; CHIEF OF POLICE
ROBERT OROSCO; OFFICER G. GIFFORD;
PATROLMAN LEE COOK-JORDAN;
OFFICER KENDRICK HERNANDEZ;
KATHLEEN A. SCHINDLER; DEMING FIRE
CHIEF RAUL MERCADO; FIRE
DEPARTMENT/EMS EMPLOYEES JULIAN
HERNANDEZ; JOSEPH OWEN, ERNESTO
GOMEZ; and DR. BASSAM AL-HOMSI,

       Defendants/Counter-Plaintiffs,

and

CITY OF DEMING; CHIEF OF POLICE
ROBERT OROSCO; OFFICER G. GIFFORD;
PATROLMAN LEE COOK-JORDAN;
OFFICER KENDRICK HERNANDEZ;
KATHLEEN A. SCHINDLER; DEMING FIRE
CHIEF RAUL MERCADO; FIRE
DEPARTMENT/EMS EMPLOYEES JULIAN
HERNANDEZ; JOSEPH OWEN, ERNESTO
GOMEZ; and DR. BASSAM AL-HOMSI,

       Third-Party Plaintiffs,

vs.

FRANCES C. CARPENTER,

       Third-Party Defendant.

# MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion to Remand and Request for Attorney's Fees, filed September 27, 2018 (Doc. 6)("Motion to Remand"); (ii) the Plaintiff's Motion to Dismiss Counterclaims and Third-Party Complaint for Failure to State Claim and Lack of Subject Matter Jurisdiction, filed October 10, 2018 (Doc. 11)("Counterclaims MTD"); and (iii) the Plaintiff's Motion to Dismiss Counterclaim and Third-Party Complaint [Doc. 36] of Defendant Kathleen A. Schindler, filed January 4, 2019 (Doc. 37)("Schindler MTD"). The Court held a hearing on December 11, 2018. See Clerk's Minutes at 1, filed December 11, 2018 (Doc. 35). The primary issues are: (i) whether this case lacks a federal question such that the Court should remand the case to state court, because Plaintiff Christina Prince is currently raising claims -- medical negligence; negligent hiring, training, supervision, and retention; loss of chance; loss of consortium; negligent investigation and failure to render aid -- arising under only state law, even though some claims implicate municipal liability and Prince requests punitive damages; and (ii) whether Defendants City of Deming, New Mexico, Robert Orosco, G. Gifford, Lee Cook-Jordan, Kendrick Hernandez, Schindler, Raul Mercado, Julian Hernandez, Joseph Owen, and Ernesto Gomez (collectively, "the Defendants") lacked an objectively reasonable basis for seeking

---

[1]On September 13, 2019, the Court entered the Order, filed September 13, 2019 (Doc. 49)("Sept. 13 Order"). In the Sept. 13 Order, the Court remanded the case to state court, denied Plaintiff Christina Prince's request for attorney's fees, dismissed without prejudice the Plaintiff's Motion to Dismiss Counterclaims and Third-Party Complaint for Failure to State Claim and Lack of Subject Matter Jurisdiction, filed October 10, 2018 (Doc. 11), and dismissed without prejudice the Plaintiff's Motion to Dismiss Counterclaim and Third-Party Complaint [Doc. 36] of Defendant Kathleen A. Schindler, filed January 4, 2019 (Doc. 37). See Sept. 13 Order at 2-3. The Court stated, however, that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for the decision. This Order is an interlocutory order; the Court has not entered an appealable final judgment. The Court will not enter the appealable final judgment until it completes the Memorandum Opinion." Sept. 13 Order at 1 n.1. This Memorandum Opinion explains the Court's reasoning in the Sept. 13 Order remanding the case.

removal such that Prince is entitled to attorney's fees under 28 U.S.C. 1447. The Court concludes that: (i) remand to the state court is appropriate, because, at this time, Prince does not raise any federal claims, does not seek any punitive damages as a result of violations of federal law, and has affirmatively stated that she is not presently seeking any relief under federal law; and (ii) the Court will not award attorneys' fees, because Prince's Complaint for Wrongful Death, Loss of Chance, and Loss of Consortium ¶¶ 57-62, at 12, filed in state court September 19, 2018, filed in federal court October 8, 2018 (Doc. 10-1)("Original Complaint") contained federal claims, and thus the Defendants were objectively reasonable in removing the case to federal court. Because the Court concludes that it lacks subject-matter jurisdiction over the case, the Court will remand the case to the County of Luna, Sixth Judicial District, State of New Mexico, will not consider the Counterclaims MTD or the Schindler MTD, and will leave those two motions for the state court to decide.

## **FACTUAL BACKGROUND**

Prince alleges that she called 911 on the evening of July 10, 2017, because her husband, David Prince, Jr., took twenty-eight Hydrocodone pills. See Plaintiff's First Amended Complaint for Wrongful Death, Loss of Chance, and Loss of Consortium ¶¶ 18-22, at 5-6, filed September 24, 2018 (Doc. 5)("Amended Complaint"). Prince alleges that, when the Deming Police Department and Deming Fire Department EMS[2] arrived, D. Prince told the police officers that he was "fine." Amended Complaint ¶ 19, at 4. Prince alleges that her husband had attempted suicide in the past but that her husband denied to the police officers that he had thoughts of harming himself. See

---

[2]Emergency Medical Services, often abbreviated as EMS, refers to providers of emergency medical care. See "What is EMS?" EMS, https://www.ems.gov/whatisems.html (last accessed April 6, 2020).

Amended Complaint ¶¶ 22-23, at 5.  Prince alleges that "EMS staff did not assess or take any vital signs for Mr. Prince," Amended Complaint ¶ 30, at 7, and that EMS personnel allowed D. Prince to sign a refusal of treatment form "despite the fact that they knew or should have known he was not of sound mind to sign any forms or refuse any treatment," Amended Complaint ¶ 32, at 7. According to Prince, the "Deming Police and EMS Defendants determined that David would have been showing signs of overdose if he took 28 Hydrocodone 30 minutes [before they arrived]." Amended Complaint ¶ 34, at 8.  In the Counterclaim and Third-Party Complaint, the Defendants allege that D. Prince declined a medical evaluation, medical treatment, or transport to the hospital, so they asked him to sign a release agreement.  <u>See</u> Counterclaim and Third-Party Complaint ¶¶ 2-3, at 7.  The release agreement states:

> Because it is sometimes impossible to recognize actual or potential medical problems outside the hospital, we strongly encourage you to be evaluated, treated if necessary, and transported to a hospital by EMS personnel for more complete examination by a physician.
>
> You have the right to choose not to be evaluated, treated or transported; however, there is the possibility that you could suffer serious complications or even death from conditions that are not apparent at this time.
>
> By signing below, you are acknowledging that EMS personnel have advised you, and that you understand, the potential harm to your health that may result from your refusal of the recommended care; and, you release EMS and supporting personnel from liability resulting from refusal.

Demin Fire Department/Emergency Medical Services Refusal of Treatment, Transport, and/or Evaluation at 1, filed October 2, 2018 (Doc. 9-1)("Release Agreement").

Prince alleges that, a few hours after EMS personnel left the residence, around 4:27 a.m. on July 11, 2017, she awoke and found D. Prince "unresponsive, not breathing and cold to the touch," so she again called 911.  Amended Complaint ¶ 18, at 4.  Prince alleges that, when the

police officers and EMS personnel responded, D. Prince's medical assessment "showed Asystole[3] with obvious signs of death." Amended Complaint ¶ 36, at 8. Prince alleges that D. Prince was pronounced dead at 6:10 a.m., and that an "autopsy showed that Mr. Prince died from the toxic effects of Hydrocodone, and that the manner of death was suicide." Amended Complaint ¶ 36, at 8. Prince alleges that, had the Deming police officers and EMS personnel "conducted a proper medical evaluation when they saw Mr. Prince on July 10, 2017, they could have prevented his death." Amended Complaint ¶ 37, at 8. Prince alleges that she is "the duly appointed Personal Representative of the Estate of David M. Prince, Jr., Deceased." Amended Complaint ¶ 3, at 2.

## PROCEDURAL BACKGROUND

Prince filed the Original Complaint in the County of Luna, Sixth Judicial District, State of New Mexico, on September 18, 2018. See Original Complaint at 2. In Count I, Prince alleges that the City of Deming, Mercado, J. Hernandez, Owen, Gomez, and Defendant Dr. Bassam Al-Homsi committed medical negligence.[4] See Original Complaint ¶¶ 45-51, at 11-12. In Count II, Prince alleges that the City of Deming, Orosco, and Mercado committed negligent hiring, training, supervision, and retention. See Original Complaint ¶¶ 52-56, at 13. In Count III, Prince brings a Monell v. Department of Social Services of New York, 436 U.S. 658 (1978)("Monell"), claim against the City of Deming, Orosco, and Mercado for "violat[ing] Federal and State law including but not limited to the Constitution." Complaint ¶ 59, at 13. See Original Complaint ¶¶ 57-62, at

---

[3]Asystole "is when there's no electricity or movement in your heart. That means you don't have a heartbeat. It's also known as flatline." "What Is Asystole?," WebMD, https://www.webmd.com/heart-disease/asystole-atrial-fibrillation#1 (last accessed March 30, 2020).

[4]The Court dismissed Dr. Al-Homsi from this case on October 29, 2018. See Order Granting Stipulated Motion to Dismiss Dr. Bassam Al-Homsi at 1, filed October 29, 2018 (Doc. 18).

13.  In Count IV, Prince brings a claim for loss of chance against all Defendants.  <u>See</u> Original Complaint ¶¶ 63-74, at 13-15.  In Count V, Prince brings a claim for loss of consortium against all Defendants.  <u>See</u> Original Complaint ¶¶ 75-80, at 15.  In Count VI, Prince alleges that the City of Deming, Orosco, Gifford, Cook-Jordan, K. Hernandez, and Schindler committed negligent investigation, and failure to render aid under the community caretaker function and emergency assistance doctrine, resulting in wrongful death under N.M. Stat. Ann. § 41-4-12.  <u>See</u> Original Complaint ¶¶ 81-97, at 16-17.

**1.      <u>The Notice of Removal.</u>**

The Defendants removed the case to federal court on September 24, 2018.  <u>See</u> Notice of Removal of Cause, filed September 24, 2018 (Doc. 1)("Notice of Removal").  The Defendants argue that the "Complaint asserts claims or rights arising under the Constitution of the United States" and that the "Court has jurisdiction pursuant to 42 U.S.C. § 1983."  Notice of Removal ¶¶ 2-3, at 2.  The Defendants contend that this case "is removable under the provisions of 28 U.S.C. § 1441, in that the claims or a portion of the claims arise under the Constitution of the United States."  Notice of Removal ¶ 3, at 2.

**2.      <u>The Amended Complaint.</u>**

Prince filed the Amended Complaint on September 24, 2018, shortly after the Defendants filed the Notice of Removal.  <u>See</u> Amended Complaint at 1.  The Amended Complaint brings the claims that the Original Complaint brings in Counts I, II, IV, V, and VI, but the Amended Complaint lacks the Original Complaint's Count III, which brings a <u>Monell</u> claim against City of Deming, Orosco, and Mercado for constitutional violations.  <u>Compare</u> Amended Complaint ¶¶ 45-91, at 8-16, <u>with</u> Original Complaint ¶¶ 45-97, at 11-17.  The Amended Complaint does not bring any additional claims.  <u>See</u> Amended Complaint ¶¶ 45-91, at 8-16.

3.        **The Motion to Remand.**

Prince filed the Motion to Remand on September 27, 2018.  See Motion to Remand at 1. Prince contends that she "brought no federal claims against Defendants but did inadvertently leave in the municipal liability claim also known as a *Monell* claim which was in the first draft of the Complaint."  Motion to Remand at 1-2.  Prince argues that she intended to file an Amended Complaint after noticing her mistake, but the Defendants filed the Notice of Removal before she had the opportunity to file an Amended Complaint.  See Motion to Remand at 2.  Prince notes that she "filed her First Amended Complaint, both in State and in Federal Court [Doc. 5] removing the inadvertently left in *Monell* claim, and requested that Defense counsel withdraw the Notice of Removal [Doc. 1] and remand the case back to State District Court, explaining the inadvertent mistake."  Motion to Remand at 2 (citing Facsimile from Frances C. Carpenter to James P. Lyle (dated September 24, 2018), filed September 27, 2018 (Doc. 6-1)).  According to Prince, Defendants' counsel agreed that he would "remand the case <u>if and only if</u> Plaintiff would reimburse him for the Federal court filing fee and waive all possible federal and federally related claims, and threatening Plaintiff's counsel with a potential claim for malicious abuse of process against Plaintiff and Plaintiff's counsel personally."  Motion to Remand at 1 (citing Facsimile from James P. Lyle to Frances C. Carpenter (dated September 25, 2018), filed September 27, 2018 (Doc. 6-2)).  Prince says that she responded to Defendants' counsel by advising him "that she believed his threat of suing her and her clients personally was unprofessional and unethical and followed with additional correspondence citing case law to that end."  Motion to Remand at 3 (citing Facsimiles from Frances C. Carpenter to James P. Lyle (dated September 25, 2018), filed September 27, 2018 (Doc. 6-3)).

Prince requests that the Court remand the case to the County of Luna, Sixth Judicial District, State of New Mexico, because "there is no federal question present that would confer federal jurisdiction over this case pursuant to 28 U.S.C. § 1983." Motion to Remand at 3. Prince asserts that "it is readily apparent from the amended complaint that Plaintiff has only brought state law claims." Motion to Remand at 4. Prince emphasizes that she does not "assert a cause of action based on a federal statute, such as a claim for a federal civil rights violation pursuant to 42 U.S.C. § 1983, nor . . . assert any federal constitutional violation." Motion for Remand at 5. Prince argues that the "Defendants have the burden to demonstrate that a federal question exists" and that the "Defendants have failed to overcome the presumption that the case should be remanded to state court." Motion to Remand at 5 (citing Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002); Dutcher v. Matheson, 733 F.3d 980, 985 (10th Cir. 2013)).

Prince also argues that she should be awarded fees for filing the Motion to Remand, because a "federal court remanding a removed case to state court for lack of subject-matter jurisdiction 'may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.'" Motion to Remand at 6 (quoting 28 U.S.C. § 1447(c)). According to Prince, "[c]ourts may award attorney's fees under § 1447(c) where the removing party lacks an objectively reasonable basis for seeking removal." Motion to Remand at 6 (citing Garrett v. Cook, 652 F.3d 1249, 1254 (10th Cir. 2011); Martin v. Franklin Capital Corp., 546 U.S. 132, 140 (2005)). Prince argues:

> Here, Defendants have no basis for not filing a withdrawal of their Notice of Removal [Doc. 1] except to try and threaten Plaintiff to limit their claims and to forever bar their right to pursue federal claims if such facts should arise during the course of litigation and in discovery that would warrant a federal claim being brought. Such a threat is not only unprofessional but unethical and places Plaintiff's counsel at odds with her clients and her professional and ethical duties to her own clients to advocate on their behalf, something Plaintiff's counsel

communicated in writing to counsel for Defendants. . . . Plaintiff does not believe it is not fair to the Court or to Plaintiffs to unduly delay this case as is being done now with the unnecessary litigation of this matter before the Court. It is clear from the amended complaint that there is no basis for removal and Plaintiff should be awarded attorneys' fees for the time and expense of litigating the unnecessary removal proceedings.

Motion to Remand at 6 (citation omitted)(alteration in Motion to Remand).

### 4.    The Counterclaim and Third-Party Complaint.

Before responding to the Motion to Remand, the Defendants answered the Complaint and filed a Counterclaim and Third-Party Complaint on October 2, 2018.[5] See Answer, Counterclaim and Third-Party Complaint of City of Deming Defendants, filed October 2, 2018 (Doc. 9)("Counterclaim and Third-Party Complaint"). The Defendants aver that, on the evening of July 10, 2017, EMS personnel and law enforcement advised D. Prince to go to the hospital for an evaluation, but D. Prince refused to go and instead signed a release agreement. See Counterclaim and Third-Party Complaint ¶ 2-3, at 7 (citing Release Agreement at 1). The Defendants argue that, by signing the Release Agreement, D. Prince "released all law enforcement officers, EMS and other medical providers associated with the City of Deming from any liability that might arise due to complications because of his refusal to follow medical advise [sic]."

---

[5]At the time that the Defendants filed the Counterclaim and Third-Party Complaint, summons had not yet been issued as to Schindler, and, thus, Schindler did not join in filing the Counterclaim and Third-Party Complaint. See Counterclaim and Third-Party Complaint at 1. On December 14, 2018, after being served, Schindler filed her Answer, Counterclaim and Third-Party Complaint of Defendant Kathleen A. Schindler, filed December 14, 2018 (Doc. 36)("Schindler Counterclaim and Third-Party Complaint"). The Counterclaim and Third-Party Complaint and the Schindler Counterclaim and Third-Party Complaint contain identical sections regarding counterclaims and third-party complaints. Compare Counterclaim and Third-Party Complaint ¶¶ 1-15, at 7-9, with Schindler Counterclaim and Third-Party Complaint ¶¶ 1-15, at 7-9. Accordingly, although this section cites to the Counterclaim and Third-Party Complaint, the Schindler Counterclaim and Third-Party Complaint makes the same arguments, and thus the Court refers to the Defendants collectively in summarizing their arguments.

Counterclaim and Third-Party Complaint ¶ 4, at 7 (citing Release Agreement at 1).  The Defendants note that Prince is the court-appointed personal representative of D. Prince's estate and "assumed the obligations set forth in" the Release Agreement.  Counterclaim and Third-Party Complaint ¶ 5, at 7.

In their counterclaim against Prince, the Defendants contend that the "Estate of David Prince, which Plaintiff represents as personal representative, breached its contract with the City of Deming EMS and support personnel which released them from any liability resulting from his refusal to accept evaluation, treatment or transport on July 10, 2017."  Counterclaim and Third-Party Complaint ¶ 6, at 7-8.  According to the Defendants, by signing the Release Agreement, D. Prince made a promise to the Defendants, upon which the Defendants relied, because the Defendants "change[d] their position by honoring Mr. Prince's desire that he not be evaluated, treated or transported when they otherwise would have done these things."  Counterclaim and Third-Party Complaint ¶ 7-8, at 8.  The Defendants argue that D. Prince's promise was "passed on by his Estate" to Prince, and that they suffered damages because of Prince's "breach of contract and promissory estoppel."  Counterclaim and Third-Party Complaint ¶ 9, at 8.

The Defendants also bring a third-party complaint against Prince's counsel, Ms. Frances C. Carpenter.  See Counterclaim and Third-Party Complaint ¶¶ 10-15, at 8-9.  The Defendants allege that Ms. Carpenter was "employed by the Plaintiff with regard to the circumstances leading up to Mr. Prince's death."  Counterclaim and Third-Party Complaint ¶ 10, at 8.  The Defendants argue that Ms. Carpenter "represented her employer in its dealings" with the Defendants.  Counterclaim and Third-Party Complaint ¶ 12, at 8.  According to the Defendants, Prince "had a right to control the manner of the details of the work performed by" Ms. Carpenter, but Prince never exercised this right of control.  Counterclaim and Third-Party Complaint ¶ 14, at 8-9.  The

Defendants contend that, because Ms. Carpenter "was an agent of employee of the Estate of Mr. Prince," both Ms. Carpenter and Prince are liable for breach of contract and promissory estoppel. Counterclaim and Third-Party Complaint ¶ 15, at 9.

5. **The Remand Response.**

The Defendants responded to the Motion to Remand on October 8, 2018. <u>See</u> Response to Plaintiff's Motion to Remand (Doc. No. 6), filed October 8, 2018 (Doc. 10)("Remand Response"). In the Remand Response, the Defendants argue that "the Amended Complaint continues to assert federal question claims." Remand Response at 2. The Defendants maintain that removal was proper, and thus Prince's "request for attorney's fees is without merit." Remand Response at 2. The Defendants argue that, because <u>Monell</u> claims are actionable under 42 U.S.C. § 1983, removal "was proper and timely under any reading of the federal removal statute, 28 U.S.C. § 1441," and thus Prince's request for attorney's fees is "meritless." Remand Response at 2. The Defendants aver that the <u>Monell</u> claims' inclusion "is not easily explained away as mistake or inadvertence," because Prince's counsel notified Defendants' agents and attorneys of Prince's "intent to bring these claims including the supervisory liability claims explicitly defined as *Monell* claims in the original complaint." Remand Response at 2. According to the Defendants, their counsel received a draft original complaint containing a <u>Monell</u> claim. <u>See</u> Remand Response at 2 (citing Original Complaint). The Defendants argue that Prince's counsel "clearly and intentionally filed, and continues to assert, federal claims. Plaintiff's counsel will not stipulate to the fact that she is not asserting any federal claims and it is clear that Plaintiff intends to assert additional federal claims in the future." Remand Response at 3.

The Defendants note that, in the Amended Complaint, Prince "continues to assert claims of negligent hiring, training and supervision against the governmental entities, department and

supervisors of the Deming Police Department and Fire Department."  Remand Response at 3 (citing Amended Complaint ¶¶ 55, 63, 85, 86, 87, at 11-12, 15).  The Defendants argue that these claims of negligent hiring, training, and supervision are <u>Monell</u> claims and thus are actionable under 42 U.S.C. § 1983.  <u>See</u> Remand Response at 3 (citing <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009)).  According to the Defendants, Prince's "supervisory and municipal liability claims must be addressed as federal constitutional questions."  Remand Response at 3-4 (citing <u>Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. 397 (1997); <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010); <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1307-08 (10th Cir. 1998)).  The Defendants also argue that the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-1 to -30, prohibits Prince's claims for punitive damages.  <u>See</u> Remand Response at 4 (citing Amended Complaint ¶¶ 56, 68, 91, at 12-13, 16; N.M. Stat. Ann. § 41-4-9(D)).  The Defendants argue that, "[a]ssuming that Plaintiff's punitive damages claims are brought in good faith, and not in clear violation of existing law, the only possible recourse Plaintiff would have for an award of these claims is under federal law."  Remand Response at 4 (citing <u>City of Newport vs. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981); <u>Bivens v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 397 (1971); <u>Patel v. Wooten</u>, 264 F. App'x 755, 759 (10th Cir. 2008)(unpublished)).  The Defendants aver that Prince continues to assert federal claims as long as she asserts punitive damages claims, with the "only alternative conclusion" being that Prince filed the Amended Complaint in violation of rule 11 of the Federal Rules of Civil Procedure.  Remand Response at 4.  The Defendants further contend that Prince "continues to seek damages for violations of federal constitutional rights."  Remand Response (citing Amended Complaint ¶¶ 58, 76, at 12, 14).

The Defendants also argue that their Counterclaim and Third-Party Complaint "involves a patient's constitutional right to refuse medical treatment," and that the Supreme Court of the

United States of America "has firmly established the constitutional nature of the right of privacy" and the "right to refuse medical treatment." Remand Response at 5 (citing <u>Bowers v. Hardwick</u>, 478 U.S. 186, 194-95 (1986); <u>Roe v. Wade</u>, 410 U.S. 113 (1973)). The Defendants maintain that "the defenses to the Plaintiff's claims, the issues raised by the Counterclaim and Third-Party Complaint and Plaintiff's continuing assertion of federal claims require analysis and evaluation of the applicable federal law inherent in all of these issues." Remand Response at 5. The Defendants thus conclude that the Court should deny the Motion to Remand. <u>See</u> Remand Response at 5.

### 6.     **The Remand Reply.**

Prince replied to the Remand Response on October 19, 2018. <u>See</u> Plaintiff's Reply in Support of Her Motion to Remand and Fees, filed October 19, 2018 (Doc. 16)("Remand Reply"). Prince argues that the "Defendants do not dispute that Plaintiff's Complaint asserts violations arising exclusively under New Mexico common and statutory law, or respond to Plaintiff's assertion that [her] Complaint can be decided without any reference to federal regulations." Remand Reply at 1. Prince emphasizes that her "complaint does not assert any federal claims as required for the federal court to have jurisdiction pursuant to 28 U.S.C. § 1331." Remand Reply at 5. Prince argues that she is not bringing a claim under 42 U.S.C. § 1983 or a <u>Monell</u> claim, because she "has alleged no claims for violations of any enumerated Constitutional right." Remand Reply at 6. Prince also avers that none of her claims "assert[s] a cause of action based on a federal statute." Remand Reply at 6. Prince contends that "claims of negligent supervision and training are properly brought under the New Mexico Tort Claims Act and there are no cases which support Defendants['] contention that these claims are federal in nature or automatically seen as *Monell* claims." Remand Reply at 7 (citing <u>Ortiz v. N.M. State Police</u>, 1991-NMCA-031, ¶ 14, 814 P.2d 117, 120). As to punitive damages, Prince argues that, although the Defendants aver that

N.M. Stat. Ann. 41-4-9(D) forbids punitive damages, N.M. Stat. Ann. § 41-4-9 contains no subsection D and does not mention punitive damages. <u>See</u> Remand Reply at 7. Prince further asserts that her punitive damages claims "do not provide the grounds needed for federal Court subject matter jurisdiction." Remand Reply at 8. Prince stresses that the Defendants have not satisfied their burden of demonstrating that a federal question exists, and thus the Court should remand the case. <u>See</u> Remand Reply at 8.

Prince argues that defenses and counterclaims implicating federal law are not bases for removal. <u>See</u> Remand Reply at 8. According to Prince, 28 U.S.C. § 1441(a) "requires federal courts considering removal petitions to decide whether they could have initially exercised jurisdiction over the case." Remand Reply at 8 (citing <u>City of Chi. v. Int'l Coll. of Surgeons</u>, 522 U.S. 156, 163 (1997); <u>Lambert Run Coal Co. v. Balt. and Ohio R.R.</u>, 258 U.S. 377, 382 (1922)). Prince avers that the "'well-pleaded complaint rule applies to the original jurisdiction of the district courts as well as to their removal jurisdiction.' Thus, a defendant may not remove based on their federal defenses or a federal counterclaim." Remand Reply at 8-9 (quoting <u>Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.</u>, 463 U.S. 1, 10 n.9 (1983), and citing <u>Homes Grp., Inc. v. Vornado Air Circulation Sys., Inc.</u>, 535 U.S. 826, 830 n.2, 831-32 (2002); <u>Rivet v. Regions Bank of La.</u>, 522 U.S. 470, 475 (1998))(citation omitted)(bold omitted). Prince asserts that, although the Defendants "state that their counter claim and third-party claim 'implicate[] federal questions about a person's constitutionally protected right to refuse medical treatment,' . . . these claims could fall under [] New Mexico's more expansive Constitution and not under the Fourteenth Amendment of the U.S. Constitution." Remand Reply at 9 (quoting Remand Response at 2, and citing <u>Daddow v. Carlsbad Mun. Sch. Dist.</u>, 1995-NMSC-032, ¶ 65, 898 P.2d 1235, 1252-53).

Prince also argues that the Defendants' removal was "objectively unreasonable." Remand Reply at 9 (bold omitted). Prince notes that, after she amended the Original Complaint and removed the <u>Monell</u> claim, she requested that the Defendants withdraw their removal. <u>See</u> Remand Reply at 9. Prince says that the Defendants responded that they would withdraw the removal if Prince "reimbursed them $400.00 and waived [her] rights to bring any federal claims in the future." Remand Reply at 10. Prince argues that the "Defendants lacked any reasonable basis to refuse to withdraw the removal and clearly understood that their removal was rendered moot upon the filing of Plaintiff's Amended Complaint." Remand Reply at 10. Prince avers that, even if the Defendants "removed this case due to confusion" about the presence of a federal question, "the Court can and should still award Plaintiff's costs and fees." Remand Reply at 10 (citing <u>Martin v. Franklin Capital Corp.</u>, 393 F.3d 1143 (10th Cir. 2004); <u>Daleske v. Fairfield Cmtys., Inc.</u>, 17 F.3d 321, 324 (10th Cir. 1994)). According to Prince, the "Defendants here failed to consider the weight of on-point case law and clearly refused to withdraw the removal unless Plaintiff's counsel agreed to his terms which involved Plaintiff's counsel committing malpractice, arguably against her own client." Remand Reply at 10. Prince thus requests that the Court award, pursuant to 28 U.S.C. § 1447(c), "reasonable costs and expenses, including attorney fees, incurred as a result of the removal." Remand Reply at 10 (citing <u>Garrett v. Cook</u>, 652 F.3d 1249, 1254 (10th Cir. 2011)).

Prince argues that, in <u>Suazo v. Taos Living Center</u>, No. 18 CV 00673 JAP/KK, 2018 WL 4773405 (D.N.M. Oct. 3, 2018)(Parker, J.), the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, "awarded attorney fees where, as in this case, Defendants argued that removal was appropriate because while Plaintiff's claims were styled as state law wrongful death and negligence claims, their case turned

on the interpretation of federal law." Remand Reply at 11. Prince quotes from <u>Suazo v. Taos</u> <u>Living Center</u>, in which Senior Judge Parker held: "'Plaintiff's claims invoke federal and/or state statutes and regulations only as standards of care. Thus, Plaintiff's claims do not turn on the interpretation of federal law in a manner that confers federal question jurisdiction.'" Remand Reply at 11 (quoting <u>Suazo v. Taos Living Ctr.</u>, 2018 WL 4773405, at *3).

Last, Prince argues that the Defendants' only basis for not withdrawing their removal is "to try and threaten Plaintiff to limit their claims and to forever bar their right to pursue federal claims if such facts should arise during the course of litigation and in discovery that would warrant a federal claim being brought." Remand Reply at 11. Prince asserts that the Defendants' "threat" is "unprofessional," "unethical," and places her counsel "at odds with her client and with their professional and ethical duties to her own client to advocate on their behalf." Remand Reply at 11. Prince reiterates that "there is no basis for removal and Plaintiff should be awarded attorneys' fees for the time and expense of litigating the unnecessary removal proceedings." Remand Reply at 12.

### 7.    **The Counterclaims MTD.**

Prince and Ms. Carpenter filed the Counterclaims MTD on October 10, 2018.[6]  <u>See</u> Counterclaims MTD at 1. In responding to the Defendants' breach-of-contract argument, Prince argues that D. Prince "lacked capacity to enter into any contract; therefore the contract, if any, is

---

[6]The Counterclaims MTD moves to dismiss the counterclaim and third-party complaint that the City of Deming, Orosco, Gifford, Cook-Jordan, Hernandez, Mercado, Hernandez, Owen, and Gomez bring, and the Schindler MTD moves to dismiss the counterclaim and third-party complaint that Schindler brings. As discussed above, the Counterclaim and Third-Party Complaint is identical in all material respects to the Schindler Counterclaim and Third-Party Complaint. Consequently, the Counterclaims MTD's text and the Schindler MTD's text are identical. <u>Compare</u> Counterclaims MTD at 1-25, <u>with</u> Schindler MTD at 1-24. Thus, although this section refers to the Counterclaims MTD, this section summarizes the arguments that all of the remaining Defendants -- City of Deming, Orosco, Gifford, Cook-Jordan, Hernandez, Schindler, Mercado, Hernandez, Owen, and Gomez -- make.

voidable; and counsel for Plaintiff is immune from suit." Counterclaims MTD at 2 (citing <u>Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.</u>, 1988-NMSC-014, ¶¶ 14-15, 750 P.2d 118, 122). Prince asserts that video and audio recordings of law enforcement and EMS personnel at Prince and D. Prince's house show that law enforcement and EMS personnel did not inform him of the "potential harm that may result from" refusing care. Counterclaims MTD at 6. Prince further states that EMS personnel did not take D. Prince's "vitals" and that "nothing was done to ensure whether Mr. Prince was of sound mind to make any informed decisions about his life." Counterclaims MTD at 6-7. According to Prince, when D. Prince signed the refusal of treatment form, he

> did not have capacity to refuse treatment because he was under the influence of an attempted-overdose level of hydrocodone; was suicidal; his wife watched him consume 28 Hydrocodone pills; had not taken his mental health medications; and as a result was unable to understand in a reasonable manner the nature and consequences of signing the document.

Counterclaims MTD at 7 (citing Restatement (Second) of Contracts § 16 (1981)). Prince argues that, under the Emergency Medical Services Act, N.M. Stat. §§ 24-10B-1 to -13, the Defendants "were authorized to treat Mr. Prince and had a duty to do so." Counterclaims MTD at 7. Prince further argues that "'an incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right.'" Counterclaims MTD at 7 (quoting <u>Cruzan by Cruzan v. Dir., Mo. Dep't of Health</u>, 497 U.S. 261, 280 (1990)).

Ms. Carpenter, Prince's attorney, argues that the Court should dismiss the claims against her, because the "Defendants allege no facts upon which to base their claim that Carpenter was an 'employee' of Mr. Prince at the time he signed the refusal of treatment form, and have no good ground for such a claim." Counterclaims MTD at 7-8 (quoting Counterclaim and Third-Party Complaint ¶ 15, at 9). Ms. Carpenter avers that attorneys are "immune from defamation suits

regarding the factual allegations pled in pleadings." Counterclaims MTD at 9 (citing <u>Romero v.</u> <u>Prince</u>, 1973-NMCA-122, ¶ 12 513 P.2d 717, 719-20). According to Ms. Carpenter, "'an attorney's liability for the attorney's professional acts has been governed by the concept of privity, and an attorney is usually not liable for an injury to a nonclient arising out of the representation of a client.'" Counterclaims MTD at 9 (quoting <u>Wallace, Saunders, Austin, Brown & Enochs,</u> <u>Chartered v. Rahm</u>, 963 S.W.2d 419, 422 n.2 (Mo. Ct. App. 1998)). Ms. Carpenter emphasizes that "the attorney owes a duty to provide services to the personal representative [of an estate] with reasonable skill and care," and she notes that, when D. Prince refused treatment, she was not his agent, and thus "there could not have been any intent to personally bind her to the refusal to consent to treatment." Counterclaims MTD at 10-11 (citing <u>Leyba v. Whitley</u>, 1995-NMSC-066, ¶ 12, 907 P.2d 172, 176). As Prince's attorney, Ms. Carpenter stresses that her relationship with her client "is not one of employee and employer but of advocate/advisor and client." Counterclaims MTD at 12 (citing N.M. Rules Ann. 16-201)(footnote omitted). Ms. Carpenter adds that a lawyer is not liable "for an error in judgment if he acts in good faith and in an honest belief that his advice and acts are well founded in the best interests of his clients." Counterclaims MTD at 12 (citing <u>George v. Caton</u>, 1979-NMCA-028, ¶ 28, 600 P.2d 822, 828).

Ms. Carpenter contends that the "'strict privity rule' [] precludes attorney liability to non-clients absent fraud, malicious conduct, or negligent participation.'" Counterclaims MTD at 13 (quoting <u>Baker v. Wood, Ris & Hames, Prof'l Corp.</u>, 2016 CO 5, ¶ 1, 364 P.3d 872, 874). Ms. Carpenter argues that the Defendants' allegations in the Counterclaim and Third-Party Complaint "do not allege any facts that Carpenter 'committed fraud or a malicious or tortious act, including negligent misrepresentation.'" Counterclaims MTD at 13 (quoting <u>Baker v. Wood, Ris & Hames,</u>

Prof'l Corp., 2016 CO 5, ¶ 2, 364 P.3d at 874). Ms. Carpenter construes the Defendants' allegations as establishing the following:

> (1) the deceased signed a refusal for transport to the hospital, (2) the Plaintiff is the court appointed personal representative of Mr. Prince's Estate and as such assumes the obligations of what was set forth in the refusal for transport, and (3) the Estate breached its contract with the City of Deming EMS by bringing suit; (4) Attorney Frances C. Carpenter "breached" the contract as aforementioned as a result of being the employee or agent of Counter-Defendant; (5) that Carpenter's client (Third Party Defendant) had a right to control the manner of the details of the work performed by Carpenter; and (6) because Carpenter was an agent or employee of the Estate of Mr. Prince, both Carpenter and the Estate of Mr. Prince are liable for breach of contract and promissory estoppel. Put differently, Defendants allege that, by performing work on behalf of her client, the Carpenter breached a contract and damaged them.

Counterclaims MTD at 13-14. Ms. Carpenter summarizes that the Defendants' third-party complaint against her should be dismissed, because: (i) "an absolute privilege applies to all statements made in a judicial proceeding and, in particular, a Complaint"; (ii) she "owed no duty to" the Defendants, and "as such did not and could not have breach[ed] any contract entered into by and between the Estate of Prince and Defendants"; (iii) she "is not an employee of The Estate of David Prince"; (iv) "an attorney cannot be held liable on a cause of action in negligence to his client's adversary"; and (v) "the strict privity rule bars Defendants' counter claims." Counterclaims MTD at 16.

As to the Defendants' counterclaims against Prince, Prince argues that it is "questionable" whether she, as the personal representative of D. Prince's estate, can be liable for breach-of-contract claims brought against her in her role as personal representative. Counterclaims MTD at 17. Prince contends that the Defendants' claims "cannot be brought against her personally as she was not a party and was not privy to the alleged contract," which she also argues "is not a valid contract and [is] voidable." Counterclaims MTD at 17. Prince also argues that she is

"afforded the same litigation privilege as" her attorney. Counterclaims MTD at 17 (citing Helena Chem. Co. v. Uribe, 2012-NMSC-021, ¶ 29, 281 P.3d 237, 244).

Prince argues that the Defendants' conduct is subject to sanctions under rule 11 of the Federal Rules of Civil Procedure, rules 1-011 and 16-804 of the New Mexico Rules Annotated, 28 U.S.C. § 1927, and the Court's inherent power. See Counterclaims MTD at 17-22. Prince contends:

> Defendants' attorney wrote a letter to Plaintiff's attorney Frances Carpenter threatening her that he was going to bring counter claims against her client (Plaintiff herein) as well as her personally. Plaintiff's counsel (Carpenter) also advised Mr. Lyle that she believed his threat of suing her and her clients personally was unprofessional and unethical and followed with additional correspondence citing case law to that end. . . . In fashioning sanctions trial courts must keep in mind that "Rule 11 sanctions are meant to serve several purposes, including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management."

Counterclaims MTD at 22 (quoting White v. General Motors Corp., Inc., 908 F.2d 675, 683 (10th Cir. 1990)). Prince notes that her counsel informed the Defendants' counsel "that she had consulted with an EMT expert regarding the case and that she under duty to her client would be bringing the claim as she believed it had merit and that any counterclaims he would bring would lack merit." Counterclaims MTD at 23. According to Prince, Ms. Carpenter explained to the Defendants' counsel "that if Defendants believed Plaintiff's claims lacked merit that the proper thing to do procedurally would be to bring a motion to dismiss under Rule 12(b)(6) rather than bringing frivolous counter claims." Counterclaims MTD at 23.

### 8.      The Counterclaims MTD Response.

The Defendants filed the Response in Opposition to Motion to Dismiss Counterclaims and Third Party Complaint (Document 11) and Memorandum in Support Thereof, filed October 16, 2018 (Doc. 13)("Counterclaims MTD Response"). The Defendants argue that the Counterclaims

MTD "is based upon a legal argument regarding a claim which does not exist and which has not been asserted." Counterclaims MTD Response at 3. The Defendants state that Ms. Carpenter "somehow believes" that the Counterclaim and Third-Party Complaint is "based upon a breach of ethical duty, negligence or malicious prosecution against her," which is "not correct." Counterclaims MTD Response at 3. The Defendants explain that they are bringing a "breach of contract claim based upon a facially valid contract which is binding in any wrongful death action on the heirs, representatives and agents of the Estate." Counterclaims MTD Response at 3. The Defendants contend that Prince and Ms. Carpenter are proper parties as, respectively, the Counter-Defendant and Third-Party Defendant. See Counterclaims MTD Response at 4-5. The Defendants argue that their Third-Party claim is proper under rule 14(a)(1) of the Federal Rules of Civil Procedure, and that joinder of Prince and Ms. Carpenter is proper under rules 19(a)(1) and 20(a)(1)-(2) of the Federal Rules of Civil Procedure. See Counterclaims MTD Response at 6. The Defendants argue that the "evidence will show the contract is valid on its face and based on the facts." Counterclaims MTD Response at 7. The Defendants contend that, to the extent that Prince and Ms. Carpenter make arguments for summary judgment, Prince and Ms. Carpenter "must do more than simply rely on the pleadings, mere argument or content of counsel. Instead they must come forward with specific facts supported by admissible evidence which demonstrates the presence of a genuine issue for trial." Counterclaims MTD at 7 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56).

The Defendants argue that their Third-Party Complaint against Ms. Carpenter is not a claim of negligence or a claim for defamation, and thus the legal authorities that Ms. Carpenter cites regarding negligence and defamation are not relevant. See Counterclaims MTD Response at 7 (citing Counterclaims MTD at 11-16). The Defendants reiterate that Ms. Carpenter "is sued only

as an agent of the Estate responsible for breaching the contract which is binding on the Estate."
Counterclaims MTD Response at 7. According to the Defendants, under the New Mexico
Wrongful Death Act, N.M. Stat. Ann. §§ 41-2-1 to -4, "an independent right of recovery exists
against the Estate for bringing the wrongful death action in direct breach of a contract prohibiting
the same, as the possible recovery for wrongful death cannot be levied." Counterclaims MTD
Response at 8 (citing N.M. Stat. Ann. §§ 41-2-1 and -3). The Defendants argue that the Supreme
Court of New Mexico "has held that an attorney may be sued in this context for breach of contract
by third-party beneficiaries to the action." Counterclaims MTD Response at 8 (citing Leyba v.
Whitley, 1995-NMSC-066, 907 P.2d 172). The Defendants explain: "*Leyba*[ v. Whitley] notes
that courts have recognized the liability of lawyers to non-clients who are third-party beneficiaries
of a lawyer-client contractual relationship. The predominant inquiry . . . has generally involved
one criteria: was the principal purpose of the attorney's retention to provide legal services for the
benefit of the plaintiff?" Counterclaims MTD Response at 8 (citing Leyba v. Whitley, 1995-
NMSC-066, 907 P.2d 172)(quotation marks omitted). The Defendants aver that they are the

> intended beneficiaries of the contract and are now the victims of the harm caused
> by [Ms. Carpenter's] decision to breach the contract. Recognition of liability to the
> third-party in [third-party beneficiary] cases does not require lawyers to undertake
> any action that is not already required by their duties to their clients.

Counterclaims MTD Response at 9. The Defendants summarize that the "Estates, and those
charged with honoring and upholding the obligations incurred by the Estate, are subject to suit
when they breach a contract the decedent executed before his death." Counterclaims MTD
Response at 10.

The Defendants note that Ms. Carpenter "has suggested and argued several times what the
Defendants should have done in her view to properly defend against these claims." Counterclaims

MTD Response at 11.  The Defendants argue that Prince and Ms. Carpenter should have "file[d] an action to set aside the contract or determine it to be invalid and subject to an injunction before they elected to proceed forward in clear violation of the terms of the contract."  Counterclaims MTD Response at 11.  The Defendants aver that, each time their counsel has told Ms. Carpenter how the Defendants intend to proceed to enforce the contract, Ms. Carpenter "has made threats despite the fact that the comments were made in good faith.  Defendants have consistently disclosed their plans for the litigation and have set forth a good faith basis for the straightforward claims asserted."  Counterclaims MTD Response at 11-12.  The Defendants argue that, although Ms. Carpenter "doesn't agree with the Defendants' view of the law or the facts," "[t]his is not grounds to impose sanctions, unless they should be imposed against" Ms. Carpenter.  Counterclaims MTD Response at 12.  The Defendants contend that the Court should consider imposing sanctions against Ms. Carpenter for violating 28 U.S.C. § 1987, because Ms. Carpenter "should have sought to have the contract vacated or deemed unenforceable before deciding to litigate in such a way that has led to an avalanche of pleadings, removals, amendments and motions to remand."  Counterclaims MTD Response at 12.  According to the Defendants, Ms. Carpenter's "assumption that the contract is not valid on its face and her refusal to address this issue before moving forward with claims that are clearly barred by the four corners of the contract is the root cause of all of the disputes which must now occupy the Court's attention."  Counterclaims MTD Response at 12.

>        **9.      The Counterclaims MTD Reply.**

Prince and Ms. Carpenter replied to the Counterclaims MTD Response on October 29, 2018, <u>see</u> Reply to Response to Motion to Dismiss [Doc. 11], filed October 29, 2018 (Doc. 20), filed an amended reply on October 30, 2018, <u>see</u> Amended Reply to Response to Motion to

Dismiss [Doc. 11], filed October 30, 2018 (Doc. 23), and filed a second amended reply on November 12, 2018, see Amended Reply to Response to Motion to Dismiss [Doc. 11], filed November 12, 2018 (Doc. 31)("Counterclaims MTD Reply").  Prince and Ms. Carpenter argue that "the relevant law and case authority show that the release is not enforceable and not binding on the Plaintiff and her attorney.  As such, Defendants' counter and third party claims of breach of contract should be dismissed as a matter of law."  Counterclaims MTD Reply at 2.

Prince and Ms. Carpenter argue that New Mexico law "is clear that 'the societal interests furthered by the law of negligence' dictate that releases of liability for negligence should never be enforceable when a risk of 'serious physical injury or death to the releasor' is at stake."  Counterclaims MTD Reply at 2 (quoting Berlangieri v. Running Elk Corp., 2003-NMSC-024, ¶¶ 10, 15, 76 P.3d 1098, 1102).  Prince and Ms. Carpenter also argue that

the Tenth Circuit agrees that 'exculpatory clauses in contracts of this kind are not favorites of the law.  They are strictly construed against the promise and will not be enforced if the promise enjoys a bargaining power superior to the promisor, as where the promisor is required to deal with the promise on his own terms. . . .  Nor will a contract be enforced if it has the effect of exempting a party from negligence in the performance of a public duty, or where a public interest is involved."

Counterclaims MTD Reply at 2-3 (quoting Tyler v. Dowell, Inc., 274 F.2d 890, 895 (10th Cir. 1960).  Prince and Ms. Carpenter argue that, because D. Prince was not taking his mental health medications and took at least twenty-eight hydrocodone pills, the "Defendants possessed a decisive advantage of bargaining strength against Mr. Prince," who was "placed under the control of the Defendants, subject to the risk of carelessness by Defendants or their agents."  Counterclaims MTD Response at 4.

Prince and Ms. Carpenter contend that "the proper method of addressing the validity of liability waivers is for the Defendant to raise it as an affirmative defense."  Counterclaims MTD

Reply at 5. They also contend that a "wrongful death estate can't be liable for the debts or obligations of the probate estate." Counterclaims MTD Reply at 5-6. According to them, the Court of Appeals of New Mexico "has ruled that the personal representative referenced in Section 41-2-3 [of the New Mexico Wrongful Death Act] is distinguishable from the personal representative of the estate of the deceased as defined in the Probate Code." Counterclaims MTD Reply at 6-7 (citing In re Estate of Sumler, 2003-NMCA-030, ¶ 8, 62 P.3d 776). Prince and Ms. Carpenter argue that the "Defendants' understanding of the duties and liabilities of the personal representative of the wrongful death suit are in error, [and] so too are their arguments regarding why Plaintiff and Ms. Carpenter are liable to the Defendants for breach of contract." Counterclaims MTD Reply at 9. They thus argue that they cannot be sued for breach of contract. See Counterclaims MTD Reply at 9. Prince and Ms. Carpenter also challenge that the Defendants' reliance on Leyba v. Whitley is misplaced, because the Supreme Court of New Mexico "never held that a defendant being sued by a [wrongful death personal representative] is a third party beneficiary of or in privity with the contract entered into by the attorney and the [wrongful death personal representative] or has any right to sue the attorney for the [wrongful death personal representative]." Counterclaims MTD Reply at 10 (emphasis in original). Last, Prince and Ms. Carpenter again argue that the conduct of the Defendants' counsel is sanctionable, because "[t]here can be no doubt that the [Defendants'] claims are frivolous, brought in bad faith, and were vexatious claims which forced [Ms. Carpenter] to put her malpractice insurance carrier on notice resulting in the possibility of an increased rate/premium as well as the payment of a $10,000.00 deductible." Counterclaims MTD Reply at 11. They also note that the Defendants' counsel "has, in the past, attempted to bring third party lawsuits against attorneys and claims which have been found to be frivolous." Counterclaims MTD Reply at 11 (citing cases).

## 10.     The Schindler MTD.

As noted above, after summons were issued upon Schindler, Prince and Ms. Carpenter filed the Schindler MTD, which is virtually identical to the Counterclaims MTD. Compare Counterclaims MTD at 1-25, with Schindler MTD at 1-24. Schindler filed for an extension to respond to the Schindler MTD, see Stipulated Motion to Extend Time for Filing of Defendants' Response to Plaintiff's Motion to Dismiss (Document No. 37), filed January 9, 2019 (Doc. 40), which the Court granted, see Stipulated Order Granting Motion to Extend Time for Filing of Defendants' Response to Plaintiff's Motion to Dismiss (Document No. 37), filed January 15, 2019 (Doc. 41). Schindler has not responded to the Schindler MTD, and, because the Counterclaims MTD and Schindler MTD are identical, the Court views the Defendants' arguments in the Counterclaims MTD Response as equally applicable to Schindler.

## 11.     The Sanctions Stipulation.

On November 7, 2018, the parties filed stipulation to withdraw all claims for sanctions. See Stipulation of Counsel, filed November 7, 2018 (Doc. 28)("Sanctions Stipulation"). Prince stipulates to the withdrawal of all "claims for sanctions sought in her Motion To Dismiss (Document No. 11) and subsequent pleadings filed in connection with respect to the issue of whether sanctions should be awarded under Fed. R. Civ. P. 11, NMRA 16-804 and 28 U.S.C. § 1927." Sanctions Stipulation ¶ 1, at 1. The Defendants filed for sanctions on October 31, 2018. See City of Deming Defendants' Motion for Rule 11 Sanctions, filed October 31, 2018 (Doc. 25). In the Sanctions Stipulation, the Defendants "stipulate to withdrawal of their Motion For Sanctions (Document No. 25) in its entirety, and stipulate to withdrawal of all of Defendants' claims for sanctions sought in their Motion For Sanctions (Document No. 25) and prior pleadings filed with the Court." Sanctions Stipulation ¶ 2, at 2.

12.     **The December 11, 2018, Hearing**.

The Court held a hearing on December 11, 2018.  See Draft Transcript of Hearing at 1 (held December 11, 2018)("Tr.").[7]  The Court began by stating that it does not believe "there are any federal claims left" and that it is skeptical that Prince is bringing a punitive damages claim. Tr. at 2:18-19 (Court).  The Court summarized that it does not think it has jurisdiction over the case.  See Tr. at 3:10-11 (Court).  The Court said that it is leaning toward granting the Motion to Remand's request for remand, but denying the request for attorney's fees, because when the Defendants removed the case, "it was objectively reasonable for them to do so because [the complaint] did state a Monell claim."  Tr. at 4:15-17 (Court).  The Court added that, if it remands the case, the state court could address the Counterclaims MTD and the Schindler MTD.  See Tr. at 5:12-16 (Court).

Prince and Ms. Carpenter said that they agree with the Court's inclination to remand the case, and that they would address the attorney's fees issue.  See Tr. at 5:17-24 (Carpenter).  Prince and Ms. Carpenter said that their main concern is "the inability to confer with [the Defendants'] counsel."  Tr. at 6:17-18 (Carpenter).  The Court stated that it does not think there is a duty for counsel to meet and confer about a notice of removal.  See Tr. at 6:22-7:4 (Court).  The Court also said that the Defendants cannot "unilaterally withdraw" the Notice of Removal, because a defendant cannot move to remand.  Tr. at 8:1-8 (Court).  Prince and Ms. Carpenter explained that the Defendants want them to stipulate that there is no federal question left and agree to remanding the case.  See Tr. at 8:9-18 (Carpenter). They said, however, that they are "disturbed" that the

_____

[7]The Court's citations to the Draft Transcript of Hearing refer to the court reporter's original, unedited versions.  The final transcript may contain slightly different page and/or line numbers.

Defendants' counsel said he would agree to remanding the case if Ms. Carpenter "put in writing that [she] will waive any federal claims ever in the future for [her] client," which she believes "puts [her] at odds with [her] client." Tr. at 8:23-9:1 (Carpenter). The Court noted that, in the briefings, Prince and Ms. Carpenter are requesting attorney's fees, because they believe that the Notice of Removal is defective, but now they are arguing that they "should get attorneys' fees because [the Defendants' counsel] didn't agree to a motion to remand." Tr. at 9:11-12 (Court). The Court asked: "Those are two different things, aren't they?" Tr. at 9:12-13 (Court). The Court added that it "may have raw judicial power to order lots of things" but is unsure of the basis for ordering attorney's fees. Tr. at 10:15-16 (Court). Prince and Ms. Carpenter concluded by stating their belief that, at this point, it is "objectively unreasonable for the continued litigation in filing and litigating the case." Tr. at 10:23-25 (Carpenter).

The Defendants countered that they believe a federal question is lurking in the case. See Tr. at 11:10-14 (Court, Lyle). According to the Defendants, Prince is still alleging "deprivation of . . . federal constitutional rights." Tr. at 12:2-3 (Lyle)(citing Firstenberg v. City of Santa Fe, N.M., 696 F.3d 1018, 1026 (10th Cir. 2012)). The Defendants noted that the Complaint brings claims under § 41-4-12 of the New Mexico Tort Claims Act, and they argue that the claim may also arise under the Constitution of the United States of America. See Tr. at 12:14-19 (Lyle). The Defendants explained that the "essence" of the Amended Complaint "is a deprivation of the decedent's right to liberty [] caused by the alleged wrongful death." Tr. at 12:21-23 (Lyle). The Defendants argued that this claim, combined "with the supervisory liability claims that permeate the complaint and remand there," and "with the claim for punitive damages," indicate that federal questions still remain in the Complaint. Tr. at 12:23-13:1 (Lyle). The Defendants asserted that respondeat superior under the New Mexico Tort Claims Act is "extremely limited," but they

conceded that it exists.  Tr. at 13:6 (Lyle).  The Defendants also argued that "the only possible vehicle for claiming punitive damages is federal law.  You cannot get them under state law. . . .  I think there is a reasonable basis to believe that the plaintiff continues to assert, or will be asserting very shortly federal claims."  Tr. at 14:8-16 (Lyle).  The Defendants said that they "would like to have a stipulation from counsel for the plaintiffs that there are no federal claims," and "a stipulation that the claims for punitive damages are withdrawn, because it could only be redressed under federal law."  Tr. at 14:22-15:2 (Lyle).

The Defendants noted that their qualified-immunity defense would disappear if the Complaint's federal claims are stripped.  See Tr. at 15:23-16:2 (Lyle, Court).  The Defendants argued that, if the Court remands the case "back to state court, discovery goes forward, the plaintiff says, hey, the discovery has revealed we have this claim, then that becomes very problematic in terms of the qualified immunity and whether the real protections of qualified immunity have been lost."  Tr. at 16:15-20 (Lyle).  The Defendants also confirmed that they are not attempting to raise any federal claims in their Third Party Complaint, which contains only a "pure breach of contract" claim.  Tr. at 17:5-6 (Lyle).  The Defendants said that they are raising a federal issue in their defense that taking D. Prince into custody or treating him against his will, which Prince argues law enforcement and EMS personnel should have done, would have violated D. Prince's federal constitutional rights.  See 17:10-18 (Lyle, Court).  According to the Defendants, "constitutionally they couldn't do anything more than they did" when they responded to Prince's 911 call.  Tr. at 18:7-8 (Lyle).

The Court asked Prince:

[W]ould you have any problem . . . if I stated in my order that the plaintiff is presently not raising any federal claims, not seeking any punitive damages as a result of violations of federal law, and that at the time this case is being remanded,

the plaintiff has affirmatively stated that she's not seeking any relief under federal law?

Tr. at 18:19-19:1 (Court).  Prince responded that she approved.  <u>See</u> Tr. at 19:2 (Carpenter).  Prince added, however, that she would not waive any rights of which she is currently unaware, but she will confirm that, "[a]t the present time," there are no federal claims.  Tr. at 19:20 (Carpenter).  Prince also stressed that she wanted to put on the record that she is not trying to avoid qualified immunity.  <u>See</u> Tr. at 20:3-11 (Carpenter).  The Court said that it is inclined to grant the Motion to Remand, because it is "not seeing a federal claim here, and there doesn't seem to be any diversity jurisdiction."  Tr. at 20:15-17 (Court).  The Court also said that it is inclined to deny Prince's request for attorney's fees, because at the time of removal, it was "objectively reasonable" for the Defendants to remove the case.  Tr. at 20:21 (Court).

The Court then instructed Ms. Carpenter to argue the Counterclaims MTD, but the Court noted that it likely would not render an opinion on the issues that the Counterclaims MTD raises.  <u>See</u> Tr. at 20:23-21:5 (Court).  The Court explained that it is "cautious about . . . giving advisory opinions," Tr. at 22:12-14 (Court), but it wants to make sure that there are no "lurking federal issue[s] in the counterclaim," Tr. at 21:7 (Court).  Ms. Carpenter characterized the Defendants' Counterclaim and Third-Party Complaint's claims as a "breach of contract claim against my client as personal representative for the wrongful death estate," and a claim "for breach of contract [against her] as Ms. Prince's, the personal representative's attorney, and as such, engaged in employee/employer relationship."  Tr. at 24:17-25 (Carpenter).  Ms. Carpenter argued that the Defendants should have asserted their Counterclaim and Third-Party Complaint "as an affirmative defense," which would "not create a basis for federal jurisdiction."  Tr. at 25:13-18 (Carpenter).  Ms. Carpenter asserted that Prince cannot be liable for breach of contract, "because she is a

personal representative for the wrongful death estate." Tr. at 27:5-6 (Carpenter). According to Ms. Carpenter, Prince "can't be held liable for any debts of the estate or the responsibilities of the estate, such as a breach of contract," and neither can Ms. Carpenter. Tr. at 27:17-19 (Carpenter). Ms. Carpenter argued that a wrongful death estate personal representative's duties are "very different" from a probate estate personal representative's duties. Tr. at 17:15 (Carpenter). Ms. Carpenter acknowledged that she filed two amended replies to the Counterclaims MTD, and she explained that the final Counterclaims MTD Reply removed a section about sanctions in the earlier replies. See Tr. at 30:17-21 (Carpenter); id. at 31:19-32:1 (Carpenter). Ms. Carpenter concluded by arguing that the Defendants "failed to articulate any case law, any statutes which confer that . . . [Prince and she] can be sued for breach of contract for the refusal of consent form that was signed by Mr. Prince." Tr. at 32:14-18 (Carpenter).

The Defendants confirmed that they are not bringing any malicious-abuse-of-process claims. See Tr. at 32:24-33:5 (Lyle). The Defendants noted that, because the Court intends to remand the case, they would not reiterate the arguments that they raised in the Counterclaims and Third-Party Complaint Response. See Tr. at 33:6-15 (Lyle). The Court then reiterated that it would likely remand the case and write an opinion. See Tr. at 34:1-16 (Court). The Court said that it would not dismiss or deny the Counterclaims MTD, and the Schindler MTD, which the Court would remand and let the state court decide. See Tr. at 34:20-35:7 (Court).

### 13.    **The Sept. 13 Order.**

The Court issued an order on September 13, 2019. See Order, filed September 13, 2019 (Doc. 49)("Sept. 13 Order"). In the Sept. 13 Order, the Court remanded the case, denied Prince's request for attorney's fees, and left the Counterclaims MTD and the Schindler MTD for the state court to decide. See Sept. 13 Order at 2-3. The Court noted that the Sept. 13 Order disposes of

the Motion to Remand, the Counterclaims MTD and the Schindler MTD, but the Court added that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for the decision. This Order is an interlocutory order; the Court has not entered an appealable final judgment. The Court will not enter the appealable final judgment until it completes the Memorandum Opinion." Sept. 13 Order at 1 n.1. This Memorandum Opinion is the promised explanation of the Court's order remanding the case.

## LAW REGARDING REMOVAL AND REMAND

If a civil action filed in state court satisfies the requirements for original federal jurisdiction -- meaning, most commonly, federal-question or diversity jurisdiction -- the defendant may invoke 28 U.S.C. § 1441(a) to remove the action to the federal district court "embracing the place where such action is pending." 28 U.S.C. § 1441(a). See Huffman v. Saul Holdings LP, 194 F.3d 1072, 1076 (10th Cir. 1999)("When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant or defendants may remove the action to federal court . . . .")(quoting Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996)). In a case with multiple defendants, there must be unanimous consent to removal; any one defendant may spoil removal and keep the case in state court. See 28 U.S.C. § 1446(b)(2)(A). Only true defendants have removal rights: plaintiffs defending counterclaims and third-party defendants may not remove an action,[8] and their consent is not

---

[8]This view is well-established with regard to plaintiffs defending counterclaims, but is an open question in the Tenth Circuit with regard to third-party plaintiffs. The better view, and the majority view, however, is that "defendants" as used in the removal statute refers to true defendants and not to third-party defendants. The Court wrote in Wiatt v. State Farm Insurance Co., 560 F. Supp. 2d 1068, 1076 (D.N.M. 2007)(Browning, J.):

> With respect to third-party defendants, courts take various views on whether they may remove cases. See NCO Fin. Sys., Inc. v. Yari, 422 F. Supp. 2d 1237,

1239 (D. Colo. 2006)(citing <u>Monmouth-Ocean Collection Serv., Inc. v. Klor</u>, 46 F. Supp. 2d 385 (D.N.J. 1999)). 28 U.S.C. § 1441(a) permits the removal of a civil action of which the district courts of the United States have original jurisdiction "by the defendant or the defendants." The majority view is that third-party defendants are not "defendants" within the meaning of § 1441(a). <u>See</u> <u>First Nat. Bank of Pulaski v. Curry</u>, 301 F.3d 456, 461-62 (6th Cir. 2002); James Wm. Moore, <u>Moore's Federal Practice</u> § 107.11[1][b][iv] ("[T]hird-party defendants are not *defendants* within the meaning of the removal statute." (emphasis in original)). Other justifications for opposing third-party defendant removal are that it would force a plaintiff to litigate in a federal court that he did not choose and to which his adversary originally could not have removed, and that allowing removal would expand jurisdiction of federal courts in contravention of the strictly construed statutory limits on the right to removal. <u>See</u> <u>NCO Fin. Sys., Inc. v. Yari</u>, 422 F. Supp. 2d 1239. Proponents of third-party removal, however, assert that the term "defendant" under § 1441(a) does not necessarily exclude third-party defendants, who, like other defendants, have been brought into court involuntarily and may have an interest in having a federal forum.

. . . .

Sister districts within the United States Court of Appeals for the Tenth Circuit have routinely held that third-party defendants that a defendant/third-party plaintiff impleads may not remove cases. <u>See</u> <u>NCO Fin. Sys., Inc. v. Yari</u>, 422 F. Supp. 2d at 1239-40; <u>Menninger Clinic Inc. v. Schilly</u>, No. CIV 92-4104, 1992 WL 373927, at *1-2 (D. Kan. Nov. 23, 1992); <u>Radio Shack Franchise Dep't v. Williams</u>, 804 F. Supp. at 152-53; <u>Elkhart Co-op Equity Exch. v. Day</u>, 716 F. Supp. 1384, 1385, 1387 (D. Kan. 1989)(cross-claim). These cases, however, involved the application of 28 U.S.C. § 1441(c) and not a plaintiff/counter-defendant impleading the third-party defendant under Rule 14(b). Arguably, some of the rationales for opposing third-party defendant removal may not apply where the plaintiff impleads a third-party defendant, because the plaintiff is the party permissively joining the third-party defendant, and in this scenario, the third-party defendant is more like a traditional defendant -- a party antagonistic to the plaintiff. <u>See</u> Moore, <u>supra</u>, § 107.11 [1][b][iv] ("The better view . . . is that third-party claims are not removable, because only a party defending against claims asserted by a plaintiff ought to be able to remove."). At least one court, however, has held that a third-party defendant a plaintiff/counter-defendant impleads cannot remove, because the third-party defendant is not a defendant within the meaning of § 1441. <u>See</u> <u>Garnas v. Am. Farm Equip. Co.</u>, 502 F. Supp. 349, 351 n.7 (D.N.D. 1980)(based on pre-1990 amendment to section 1441(c)).

The Tenth Circuit has not spoken definitively on the propriety of third-party removal. <u>See</u> <u>NCO Fin. Sys., Inc. v. Yari</u>, 422 F. Supp. 2d at 1240. It is therefore

required for removal if all the true defendants consent.  See Hamilton v. Aetna Life & Cas. Co., 5

F.3d 642, 643-44 (2d Cir. 1993); Wiatt v. State Farm Ins. Co., 560 F. Supp. 2d 1068 (D.N.M.

2007)(Browning, J.).  "A plaintiff objecting to the removal may file a motion asking the district

court to remand the case to state court."  Huffman v. Saul Holdings LP, 194 F.3d at 1076 (citing

Caterpillar Inc. v. Lewis, 519 U.S. at 69).

   To remove a case based on diversity, the diverse defendant must demonstrate that all of the

usual prerequisites of diversity jurisdiction are satisfied.  Under 28 U.S.C. § 1332(a), a federal

district court possesses original subject-matter jurisdiction over a case when the parties are diverse

in citizenship and the amount in controversy exceeds $75,000.00.  See 28 U.S.C. § 1332(a);

Johnson v. Rodrigues, 226 F.3d 1103, 1107 (10th Cir. 2000).  Diversity between the parties must

be complete.  See Caterpillar Inc. v. Lewis, 519 U.S. at 68; Radil v. Sanborn W. Camps, Inc., 384

F.3d 1220, 1225 (10th Cir. 2004).  In addition to the requirements of original jurisdiction,

§ 1441(b)(2) lays out the "forum-defendant rule," which provides that a case may not be removed

on the basis of diversity jurisdiction if any defendant is a citizen of the state in which the state-court

---

   an open question in this circuit whether a third-party defendant, who the plaintiff
   impleaded, may remove a case.

Wiatt v. State Farm Insurance Co., 560 F. Supp. 2d at 1076 (citations omitted).  The Court
ultimately concluded that it "need not resolve this issue, because assuming, without deciding, that
a third-party defendant impleaded under rule 14(b) may attempt removal, Allstate has not met its
burden to establish the Court's diversity jurisdiction over the claims against it."  560 F. Supp. 2d
at 1078.  In any case, the Court has since held that a third party may not remove a case.  See Mach
v. Triple D Supply, LLC, 773 F. Supp. 2d 1018, 1051 (D.N.M. 2011)(Browning, J.)("The Supreme
Court has already established that cross-defendants may not remand; there is no valid distinction
between cross-defendants, counter-defendants, and third-party defendants for the purposes of
28 U.S.C. § 1441(a).  The Court thus agrees with those courts that have held only original
defendants may remove cases under 28 U.S.C. § 1441(a).").

action was brought.  <u>Brazell v. Waite</u>, 525 F. App'x 878, 884 (10th Cir. 2013)(unpublished).[9]  The

Tenth Circuit wrote:

> [W]e note that § 1441(b)(2) -- the so-called forum-defendant rule -- provides as a separate requirement that "[a] civil action otherwise removable solely on the basis of [diversity] jurisdiction . . . may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

<u>Brazell v. Waite</u>, 525 F. App'x at 884 (alteration in original)(quoting 28 U.S.C. § 1441(b)(2)).  <u>See</u>

<u>City of Albuquerque v. Soto Enters., Inc.</u>, 864 F.3d 1089, 1096 n.11 (10th Cir. 2017)("The

forum-defendant rule prohibits removal when a case is removed for diversity jurisdiction and the

defendant 'is a citizen of the State in which such action is brought.'" (quoting 28 U.S.C.

§ 1441(b)(2))).   The forum-defendant rule applies only to cases removed under diversity

jurisdiction; a defendant may remove a case brought against it in its home state on the basis of

federal-question jurisdiction.  <u>See</u> 28 U.S.C. § 1441(b).  Last, a case cannot be removed if it began

with a nondiverse party or forum-citizen defendant, and only later came to satisfy the requirements

---

[9]<u>Brazell v. White</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that <u>Brazell v. Waite</u>, 525 F. App'x 878 (10th Cir. 2013), <u>Browning v. American Family Mutual Insurance Co.</u>, 396 F. App'x 496 (10th Cir. 2010), <u>Jenkins v. MTGLQ Investors</u>, 218 F. App'x. 719 (10th Cir. 2007), <u>Oklahoma Farm Bureau Mutual Insurance Co. v. JSSJ Corp.</u>, 149 F. App'x 775 (10th Cir. 2005), <u>Watkins v. Terminix International Co.</u>, Nos. CIV 96-3053, 96-3078, 1997 WL 34676226 (10th Cir. May 22, 1997), all have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion.

of removal jurisdiction, unless: (i) the plaintiff voluntarily dismissed the removal-spoiling party, see DeBry v. Transamerica Corp., 601 F.2d 480, 488 (10th Cir. 1979); Flores-Duenas v. Briones, No. CIV 0660, 2013 WL 6503537, at *12 n.6, *26 (D.N.M. Dec. 1, 2013)(Browning, J.) (describing the operation of the "voluntary-involuntary" rule)[10]; or (ii) the removal-spoiling party was fraudulently joined or procedurally misjoined.

### 1.     The Presumption Against Removal.

Federal courts are courts of limited jurisdiction; thus, there is a presumption against removal jurisdiction, which the defendant seeking removal must overcome.  See Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995); Fajen v. Found. Reserve Ins. Co., 683 F.2d at 333; Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, No. CIV 08-0812, 2009 WL 1324119, at *4 (D.N.M. Apr. 30, 2009)(Browning, J.)("Removal statutes are strictly construed, and ambiguities should be resolved in favor of remand.").  The defendant seeking removal must establish that federal court jurisdiction is proper "by a preponderance of the evidence."  McPhail v. Deere & Co., 529 F.3d at 953 (10th Cir. 2008).  See Bonadeo v. Lujan, 2009 WL 1324119, at *4 ("As the removing party, the defendant bears the burden of proving all jurisdictional facts and of establishing a right to removal.").  Because federal courts are courts of limited jurisdiction, the Tenth Circuit has ruled that "courts must deny such jurisdiction if not affirmatively apparent on

---

[10]The Tenth Circuit explained:

The general effect of the [voluntary-involuntary] test is that a cause cannot be removed where the removability is a result of some development other than a voluntary act of plaintiff.  The cause cannot be removed as a result of evidence from the defendant or the result of a court order rendered on the merits of the case.

DeBry v. Transamerica Corp., 601 F.2d at 488 (citation omitted).

the record." Okla. Farm Bureau Mut. Ins. Co. v. JSSJ Corp., 149 F. App'x 775, 778 (10th Cir. 2005)(unpublished).  On the other hand, this strict construction and presumption against removal should not be interpreted as a hostility toward removal cases in the federal courts.  See McEntire v. Kmart Corp., 2010 WL 553443, at *2 (citing Bonadeo v. Lujan, 2009 WL 1324119, at *12 ("Strict construction does not mean judicial hostility toward removal.  Congress provided for removal, and courts should not create rules that are at tension with the statute's language in the name of strict construction.")).

"It is well-established that statutes conferring jurisdiction upon the federal courts, and particularly removal statutes, are to be narrowly construed in light of our constitutional role as limited tribunals."  Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1095 (10th Cir. 2005)(citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941); United States ex rel. King v. Hillcrest Health Ctr., 264 F.3d 1271, 1280 (10th Cir. 2001)).  "All doubts are to be resolved against removal."  Fajen v. Found. Reserve Ins. Co., 683 F.2d 331, 333 (10th Cir. 1982).  "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction."  Montoya v. Chao, 296 F.3d 952, 955 (10th Cir. 2002).

2.     **Removal's Procedural Requirements**.

Section 1446 of Title 28 of the United States Code governs the procedure for removal. "Because removal is entirely a statutory right, the relevant procedures to effect removal must be followed."  Thompson v. Intel Corp., 2012 WL 3860748, at *5.  A removal that does not comply with the express statutory requirements is defective, and the Court must, upon request, remand the case to state court.  See Huffman v. Saul Holdings LP, 194 F.3d at 1077.  See also Chavez v. Kincaid, 15 F. Supp. 2d 1118, 1119 (D.N.M. 1998)(Campos, J.)("The [r]ight to remove a case that was originally in state court to federal court is purely statutory, not constitutional.").

Section 1446(a) provides that a party seeking removal of a matter to federal court shall file a notice of removal in the district and division where the state action is pending, "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." Such notice of removal is proper if filed within thirty-days from the date when the case qualifies for federal jurisdiction. See Caterpillar Inc. v. Lewis, 519 U.S. at 68-69; 28 U.S.C. § 1446(b). The Tenth Circuit has further elaborated that, for the thirty-day period to begin to run, "this court requires clear and unequivocal notice from the [initial] pleading itself" that federal jurisdiction is available. Akin v. Ashland Chem. Co., 156 F.3d 1030, 1036 (10th Cir. 1998). The Tenth Circuit specifically disagrees with "cases from other jurisdictions which impose a duty to investigate and determine removability where the initial pleading indicates that the right to remove may exist." Akin v. Ashland Chem. Co., 156 F.3d at 1036.[11]

After the notice of removal is filed, all state-court proceedings are automatically stayed, and the other defendants in the case -- if not all defendants joined in the removal -- have thirty days to consent to the removal of the action. See 28 U.S.C. § 1446(b)(2). "When a civil action is removed solely under section 1441(a) [the standard removal statute, which excludes multiparty, multiforum jurisdiction], all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A). The failure of all defendants to consent to removal will result in remand. See Tate v. Mercedes-Benz USA, Inc., 151 F. Supp. 2d

---

[11]Congress clarified removal jurisdiction and procedures in the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758. See Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012 WL 3860748, at *12 n.5 (D.N.M. Aug. 27, 2012)(Browning, J.)(discussing the Act).

222, 223-24 (N.D.N.Y. 2001)("Absent such consent, the removal petition is defective and the usual course of conduct is for the federal court to remand the action back to state court.").  The rule of unanimity applies to all defendants, whether they are required parties under rule 19 or merely proper parties under rule 20.  See 14C C. Wright & A. Miller, Federal Practice & Procedure § 3730, at 459 (4th ed. 2009).  Defendants who have not been served, however, need not join in removal. See Kiro v. Moore, 229 F.R.D. 228, 230-32 (D.N.M. 2005)(Browning, J.).

Section 1447(c) permits the district court to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  The Supreme Court has stated:

> The appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied.

Martin v. Franklin Capital Corp., 546 U.S. at 140.  The Tenth Circuit has limited district courts' discretion to impose costs and fees to those cases in which the removal was objectively unreasonable.  See Garret v. Cook, 652 F.3d 1249, 1254 (10th Cir. 2011)("[C]ourts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.").

The Court awarded costs and attorneys' fees to a plaintiff in New Mexico ex rel. Balderas v. Valley Meat Co., LLC, because the Court determined that the removal motion was objectively unreasonable.  See No. CIV 14-1100, 2015 WL 3544288, at *26 (D.N.M. May 20, 2015) on reconsideration in part sub nom. New Mexico v. Valley Meat Co., LLC, No. CIV 14-1100, 2015 WL 9703255 (D.N.M. Dec. 14, 2015)(Browning, J.).  The Court determined that: (i) the party seeking removal -- D'Allende Meats -- was not statutorily authorized to file removal, because

D'Allende Meats was not a defendant; (ii) D'Allende Meats did not obtain any defendants' affirmative consent to removal, which is necessary even if joint counsel represents each defendant; (iii) D'Allende Meats' assertion that the Court had civil-rights jurisdiction over the case lacked a sound basis in the case's facts; and (iv) neither the case's facts or case law supported D'Allende Meats' assertion that the Court had federal-question jurisdiction. See 2015 WL 3544288, at *26. The Court concluded that "[f]ailure on any one of these bases would, on its own, justify remand[, but] [w]hiffing on all four warrants the imposition of costs and fees." 2015 WL 9703255, at *27.

**3.      Amendment of the Notice of Removal.**

In Caterpillar, Inc. v. Lewis, the Supreme Court held that a defect in subject-matter jurisdiction cured before entry of judgment did not warrant reversal or remand to state court. See 519 U.S. at 70-78. Citing Caterpillar, Inc. v. Lewis, the Tenth Circuit has held that "a defect in removal procedure, standing alone, is not sufficient to warrant vacating judgment and remand to state court if subject matter jurisdiction existed in the federal court." Browning v. Am. Family Mut. Ins. Co., 396 F. App'x 496, 505-06 (10th Cir. 2010)(unpublished). In McMahon v. Bunn-O-Matic Corp., 150 F.3d 651 (7th Cir. 1998)(Easterbrook, J.), the United States Court of Appeals for the Seventh Circuit noticed, on appeal, defects in the notice of removal, including that the notice failed to properly allege diversity of citizenship. See 150 F.3d at 653 ("As it happens, no one paid attention to subject-matter jurisdiction . . . ."). The Seventh Circuit nevertheless permitted the defective notice of removal to be amended on appeal to properly establish subject-matter jurisdiction. See 150 F.3d at 653-54.

The Tenth Circuit has allowed defendants to remedy defects in their petition or notice of removal. See Jenkins v. MTGLQ Investors, 218 F. App'x 719, 723 (10th Cir. 2007)(unpublished)(granting unopposed motion to amend notice of removal to properly allege

jurisdictional facts); Watkins v. Terminix Int'l Co., Nos. CIV 96-3053, 96-3078, 1997 WL 34676226, at *2 (10th Cir. May 22, 1997)(per curiam)(unpublished)(reminding the defendant that, on remand, it should move to amend the notice of removal to properly allege jurisdictional facts); Lopez v. Denver & Rio Grande W. R.R. Co., 277 F.2d 830, 832 (10th Cir. 1960)("Appellee's motion to amend its petition for removal to supply sufficient allegations of citizenship and principal place of business existing at the time of commencement of this action is hereby granted, and diversity jurisdiction is therefore present."). The Tenth Circuit has further reasoned that disallowing amendments to the notice of removal, even after the thirty-day removal window had expired, when the defendant made simple errors in its jurisdictional allegations, "would be too grudging with reference to the controlling statute, too prone to equate imperfect allegations of jurisdiction with the total absence of jurisdictional foundations, and would tend unduly to exalt form over substance and legal flaw-picking over the orderly disposition of cases properly committed to federal courts." Hendrix v. New Amsterdam Cas. Co., 390 F.2d 299, 301 (10th Cir. 1968). The Tenth Circuit has noted that a simple error in a jurisdictional allegation includes failing to identify a corporation's principal place of business or referring to an individual's state of residence rather than citizenship. See Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 301. In McEntire v. Kmart Corp., when faced with insufficient allegations in the notice of removal -- allegations of "residence" not "citizenship" -- the Court granted the defendants leave to amend their notice of removal to cure the errors in some of the "formalistic technical requirements." 2010 WL 553443, at *8 (citing Hendrix v. New Amsterdam Cas. Co., 390 F.2d at 300-02). Further, in Thompson v. Intel Corp., the Court permitted the defendant, Intel Corp., to amend its notice of removal to include missing jurisdictional elements, including evidence that its principal place of business and corporate headquarters -- the center of Intel Corp.'s direction, control, and

coordination of activities -- is out of state, so that the diversity requirements were met.  See 2012

WL 3860748, at *1.

There are limits to the defects that an amended notice of removal may cure, however, as

Professors Charles Alan Wright and Arthur R. Miller explain:

> [A]n amendment of the removal notice may seek to accomplish any of several
> objectives: It may correct an imperfect statement of citizenship, state the previously
> articulated grounds more fully, or clarify the jurisdictional amount.  In most
> circumstances, however, defendants may not add completely new grounds for
> removal or furnish missing allegations, even if the court rejects the first-proffered
> basis of removal, and the court will not, on its own motion, retain jurisdiction on
> the basis of a ground that is present but that defendants have not relied upon.

14 C. Wright & A. Miller, Federal Practice & Procedure § 3733, at 651-59 (4th rev. ed.

2019)(footnotes omitted).  Professor James William Moore has similarly recognized:

"[A]mendment may be permitted after the 30-day period if the amendment corrects defective

allegations of jurisdiction, but not to add a new basis for removal jurisdiction."  16 J. Moore, D.

Coquillette, G. Joseph, S. Schreiber, G. Vairo, & C. Varner, Moore's Federal Practice

§ 107.30[2][a][iv], at 107-317 to -18 (3d ed. 2013).  Thus, where diversity jurisdiction is asserted

as a basis for removal of an action to federal court, the district court may permit the removing

defendant to amend its removal notice, if necessary, to fully allege facts which satisfy the

requirements of diversity jurisdiction by a preponderance of the evidence.  See Carrillo v. MCS

Indus., Inc., No. CIV 12-0573, 2012 WL 5378300, at *14 (D.N.M. Oct. 15, 2012)(Browning,

J.)(permitting party to amend its notice of removal when the removing party did "not assert[] a

new basis for jurisdiction, or a new allegation not present in its Notice of Removal; rather, the . . .

Amended Notice of Removal provide[d] greater detail regarding the same basis for jurisdiction

asserted in the . . . Notice of Removal").  Cf. New Mexico ex rel. Balderas v. Valley Meat Co.,

No. CIV 14-1100, 2015 WL 3544288, at *25 (D.N.M. May 20, 2015)(Browning, J.)(denying

amendment when it sought to assert a new jurisdictional basis that was not raised in the notice of removal).

**4.      Attorney's Fees Under 28 U.S.C. § 1447(c).**

A federal court remanding a removed case to state court for lack of subject-matter jurisdiction "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  The Supreme Court has clarified the standards governing an award of fees under § 1447(c).  "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.  Conversely, when an objectively reasonable basis exists, fees should be denied."  Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005).  It is not necessary that the plaintiff show that the defendants acted in bad faith to win attorney's fees.  See Topeka Housing Authority v. Johnson, 404 F.3d 1245, 1248 (10th Cir. 2005).

**LAW REGARDING FEDERAL-QUESTION JURISDICTION**

Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction.  See Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974); Chavez v. Kincaid, 15 F. Supp. 2d at 1119.  A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  There is a federal question if the case arises under the Constitution, laws, or treaties of the United States.  See 28 U.S.C. § 1331.  Whether a case arises under a federal law is determined by the "wellpleaded complaint rule," Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987)(citing Gully v. First Nat'l Bank, 299 U.S. 109, 112-13 (1936)).  This

determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 10 (citing Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)). The Supreme Court has further limited subject-matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 25-26. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986). See Sandoval v. New Mexico Tech. Grp., L.L.C., 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("Merrell Dow is the controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. at 810.

In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" Nicodemus v. Union Pac. Corp., 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001)). If the resolution turns on a substantial question of federal law, the federal question must also be "contested." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313 (2005). Finally, the exercise of

federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." 542 U.S. at 313. Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being bombarded with cases traditionally heard in state courts. 542 U.S. at 313. See Darr v. N.M. Dep't of Game & Fish, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 314)); Bonadeo v. Lujan, 2009 WL 1324119, at *7-9.

## LAW REGARDING THE NEW MEXICO TORT CLAIMS ACT

The New Mexico Legislature enacted the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-1 to -30 ("NMTCA"), because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2(A). The New Mexico Legislature, however, also recognized

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A). As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act." N.M. Stat. Ann. § 41-4-2(A). The NMTCA is also "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(C). The NMTCA is the

exclusive remedy against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act and no other claim, civil action or proceeding for damages, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).

A plaintiff may not sue a New Mexico governmental entity or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions that the NMTCA grants for governmental entities and public employees. See Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d at 256 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."),[12] rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. "A plaintiff also may not sue a governmental entity or its employees for a damage claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1251 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished). Accord Barreras v. State of N.M. Corr. Dep't, 2003-NMCA-027 ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently

---

[12]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Begay v. State, that, for a plaintiff to sue a governmental entity, the entity must come within one of the NMTCA's exceptions, and that a plaintiff may not imply the governmental entity's consent to suit. Section 41-4-2 provides in part: "[I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act." N.M. Stat. Ann. § 41-4-2. The NMTCA also states that governmental entities and public employees acting in the scope of their duties shall be immune from liability for torts except as the NMTCA waives. See N.M. Stat. Ann. § 41-4-4. The Supreme Court of New Mexico has consistently reaffirmed that, for a plaintiff to sue a governmental entity or public employee acting within the scope of his or her duties, an NMTCA immunity waiver must apply. See, e.g., Thompson v. City of Albuquerque, 2017-NMSC-021 ¶ 6, 397 P.3d 1279, 1281; Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 6, 916 P.2d at 1313; Silva v. State, 1987-NMSC-107, ¶ 41, 745 P.2d 380, 388.

declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New

Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims

Act.");[13] Chavez v. City of Albuquerque, 1998-NMCA-004 ¶ 8, 952 P.2d 474, 477 (noting that a

plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against

a city or its employees or agents unless the NMTCA waives immunity);[14] Rubio v. Carlsbad Mun.

Sch. Dist., 1987-NMCA-127 ¶ 11, 744 P.2d 919, 922 (holding that no waiver of immunity exists

for damages arising out of alleged educational malpractice claim against a school board);[15] Begay

v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 (finding that no waiver existed in NMTCA for

suit for damages under Article II, § 11 of the New Mexico Constitution -- a provision that protects

the "free exercise of religion").  The NMTCA does not limit the availability of many forms of

---

[13]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with Barreras v. State of New Mexico Corrections Department that, absent affirmative legislation, New Mexico courts do not permit private lawsuits to enforce New Mexico constitutional rights if no NMTCA immunity waiver applies.  In Begay v. State, the Supreme Court of New Mexico dismissed plaintiff's state constitutional claims against a governmental entity, because no NMTCA waiver applied.  See Begay v. State, 1985-NMCA-117 ¶ 14, 723 P.2d at 257 ("We have determined that plaintiffs may not sue the state without its consent and that there is no express waiver for the medical examiner under the Tort Claims Act.").  The Court notes that in Begay v. State, as discussed supra n.16, clarifies that "[c]onsent to be sued may not be implied" under the NMTCA.  Begay v. State, 1985-NMCA-117 ¶ 10, 723 P.2d 252, 256.

[14]For the reasons discussed supra n.13, the Court concludes that the Supreme Court of New Mexico would, if presented with the issue, agree with this assertion in Chavez v. City of Albuquerque.

[15]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Rubio v. Carlsbad Municipal School District, because none of the express waivers under §§ 41-4-5 to -12 permit recovery for damages arising out of educational malpractice claims, and § 41-4-4(A) clearly exempts governmental entities and public employees acting within the scope of their duties from liability except as waived in sections 41-4-5 to -12. See N.M. Stat. Ann. §§ 41-4-5 to -12.  As discussed supra n.16, the Supreme Court of New Mexico requires an express NMTCA immunity waiver to permit an NMTCA suit against a governmental entity or a public employee acting within the scope of his or her duties.

equitable relief.  See N.M. Stat. Ann. § 41-4-17(A) ("Nothing in this section shall be construed to prohibit any proceedings for mandamus, prohibition, habeas corpus, certiorari, injunction or quo warranto."); El Dorado Utils. Inc. v. Eldorado Area Water and Sanitation Dist., 2005-NMCA-036 ¶ 28, 109 P.3d 305, 312 ("The Tort Claims Act would not bar a claim for injunctive relief.").[16] Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed.  See Begay v. State, 1985-NMCA-117 ¶ 8, 723 P.2d at 255.

## LAW REGARIDNG NMTCA § 41-4-6

Section 41-4-6 exempts from immunity "liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."  N.M. Stat. Ann. § 41-4-6.  Section 41-4-6's exemption balances the principle that "government should not have the duty to do everything that might be done" with the desire "to compensate those injured by the negligence of public employees and to impose duties of reasonable care."  Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d 1143, 1145 (citations and internal quotation marks omitted).  To resolve the tension between these two goals, § 41-4-6 "grant[s] governmental entities and employees a general

----

[16]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with El Dorado Utilities, Inc. v. Eldorado Area Water and Sanitation District, that nothing in the NMTCA bars a separate claim for injunctive relief.  While the Supreme Court of New Mexico has clarified that the NMTCA is "the exclusive remedy for any action for damages against the government," Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d 1132, 1135, the Act only limits damages brought against the state or state employees acting within the scope of their duty and does not limit plaintiffs from seeking other forms of injunctive relief, see Bd. of Cty. Comm'rs of San Miguel Cty. v. Risk Mgmt. Div., 1995-NMSC-046 ¶ 14, 899 P.2d at 1135.

immunity from tort liability, [and] waive[s] that immunity in certain defined circumstances."

Cobos v. Doña Ana Cty. Hous. Auth., 1998-NMSC-049 ¶ 6, 970 P.2d at 1145.  Section 41-4-6

> allows individual claims against governmental entities that are based on "the
> negligence of public employees while acting within the scope of their duties in
> the operation or maintenance of any building, public park, machinery, equipment,
> or furnishings."  [NMTCA § 41-4-6].  For the waiver to apply, the negligent
> "operation or maintenance" must create a dangerous condition that threatens the
> general public or a class of users of the building.

Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

The Supreme Court of New Mexico has adopted a broad interpretation of what constitutes

a "building, public park, machinery, equipment, or furnishings."  N.M. Stat. Ann.  § 41-4-6.  Like

common-law premises liability, the § 41-4-6 waiver may apply even when the negligence at issue

occurred outside the boundaries of property owned and operated by the government.  "[T]he duty

of a landowner to exercise ordinary care to avoid creating, or permitting an unreasonable risk of

harm to others is not determined by . . . the happenstance that the accident and resulting injury

occur inside or outside the property boundary."  Bober v. N.M. State Fair, 1991-NMSC-031 ¶ 12,

808 P.2d 614, 618-19.  The Supreme Court of New Mexico explained, furthermore, that "[w]hile

[§] 41-4-6 may appropriately be termed a 'premises liability' statute, the liability envisioned by

that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as

the words 'machinery' and 'equipment' reveal."  Cobos v. Doña Ana Cty. Hous. Auth.,

1998-NMSC-049 ¶ 9, 970 P.2d at 1146 (quoting N.M. Stat. Ann. § 41-4-6).  Also, like common-

law premises liability, § 41-4-6 does not require that the negligence be related to a physical aspect

of the building, machinery, or equipment.  "The waiver applies to more than the operation or

maintenance of the physical aspects of the building, and includes safety policies necessary to

protect the people who use the building.")  Encinias v. Whitener Law Firm, P.A., 2013-NMCA-

045 ¶ 10, 299 P.3d 424, 428 (quoting Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 9, 141

P.3d at 1261). Section 41-4-6 instead "contemplates waiver of immunity where due to the alleged

negligence of public employees an injury arises from an unsafe, dangerous, or defective condition

on property owned and operated by the government." Bober v. N.M. State Fair, 1991-NMSC-031

¶ 27, 808 P.2d at 623 (citations and internal quotation marks omitted).

The Supreme Court of New Mexico has also interpreted § 41-4-6's phrase "operation and

maintenance" somewhat broadly. See N.M. Stat. Ann. § 41-4-6. "[Operation and maintenance]

is not 'limited [in] its applicability strictly to defects in the physical building.'" Johnson ex rel.

Estate of Cano v. Holmes, 455 F.3d 1133, 1139 (10th Cir. 2006)(quoting Upton v. Clovis Mun.

Sch. Dist., 2005-NMCA-085 ¶ 6, 141 P.3d at 1260-61). New Mexico courts have, however, found

that § 41-4-6's waiver of immunity does not extend to negligent supervision, see Pemberton v.

Cordova, 1987-NMCA-020 ¶ 5, 734 P.2d at 256,[17] negligent design, see Rivera v. King, 1988-

---

[17]If presented with the issue, the Court predicts that the Supreme Court of New Mexico
would agree with Pemberton v. Cordova, that negligent supervision generally does not waive
immunity. The Supreme Court of New Mexico clarified in Encinias v. Whitener Law Firm, P.A.,
2013-NMSC-045 ¶ 14, 310 P.3d 611, 617, that while there is no waiver of immunity for negligent
supervision, "prisons cannot turn a blind eye to threats to their inmates' safety." 2013-NMSC-045
¶ 14, 310 P.3d at 617. Although the Supreme Court of New Mexico clarified in Encinias v.
Whitener Law Firm, P.A. that the Court of Appeals of New Mexico's narrow read of § 41-4-6(A)
has since been discredited, it acknowledged that "its central premise, when analyzed under a
premises liability theory, is still valid." Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045
¶ 13, 310 P.3d at 617. Negligent supervision alone is not enough to waive immunity under
§ 41-4-6(A), but allegations that a governmental entity was negligent "in failing to exercise
reasonable care to discover and prevent dangerous conditions caused by people on its premises,"
even where that care is supervisory in nature, might waive immunity under § 41-4-6(A).
See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 13, 310 P.3d at 617. In Espinoza v.
Town of Taos, 1995-NMSC-070, 905 P.2d 718, the Supreme Court of New Mexico stated:
"However, Section 41-4-6 does not grant a waiver for claims of negligent supervision. . . ."
Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (citing Pemberton v. Cordova,
1987-NMCA-020 ¶ 5, 734 P.2d at 256).

NMCA-093 ¶¶ 29-34, 765 P.2d 1187, 1194, <u>cert. denied</u>, No. 18,041, 765 P.2d 758 (1988)(unpublished table opinion),[18] negligent inspection, <u>see</u> <u>Martinez v. Kaune</u>, 1987-NMCA-131 ¶¶ 5-10, 745 P.2d 714, 716-17, <u>cert. denied</u>, No. 17,361, 744 P.2d 912 (1987)(unpublished table opinion),[19] negligent regulation and investigation of violations, <u>see</u> <u>Caillouette v. Hercules, Inc.</u>, 1992-NMCA-008 ¶ 31, 827 P.2d 1306, 1312;[20] or negligent

---

[18]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with <u>Rivera v. King</u> that negligent design does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent design)(citing <u>Rivera v. King</u>, 1988-NMCA-093 ¶¶ 29-34, 765 P.2d at 1194).

[19]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with <u>Martinez v. Kaune</u> that negligent inspection does not fit within § 41-4-6's grounds for an immunity waiver, based on <u>Espinoza v. Town of Taos</u>, 1995-NMSC-070 ¶ 8, 905 P.2d at 721 (stating that § 41-4-6 does not grant a waiver for claims of negligent inspection)(citing <u>Martinez v. Kaune</u>, 1987-NMCA-131 ¶¶ 5-10, 745 P.2d at 716-17).

[20]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico in <u>Caillouette v. Hercules, Inc.</u> that negligent regulation and investigation of violations alone does not fall within the scope of the § 41-4-6 waiver, based on the Supreme Court of New Mexico's decision in <u>Romero v. State</u>, 1991-NMSC-071, 851 P.2d 628, and its denial of certiorari after <u>Caillouette v. Hercules</u>. In <u>Romero v. State</u>, the Supreme Court of New Mexico concluded that the New Mexico State Highway Department's statutory responsibilities constituted supervision of "maintenance" and fell within the § 41-4-6 waiver's scope. 1991-NMSC-071 ¶ 6, 815 P.2d at 630. The Supreme Court of New Mexico stated that "the greater supervisory responsibilities contemplated by the 1986 law included more than issuing regulations. Those responsibilities could have included supervising the county's actual day-to-day maintenance of the roadway." <u>Romero v. State</u>, 1991-NMSC-071 ¶ 9, 815 P.2d at 630. In <u>Romero v. State</u>, the Supreme Court of New Mexico suggested that, if the Highway Department's only responsibility had been to issue regulations, its actions would not have constituted maintenance. <u>See</u> 1991-NMSC-071 ¶ 9, 815 P.2d at 630. Although the Court is reluctant to read too much into the denial of a petition for certiorari, the Supreme Court of New Mexico did deny certiorari in <u>Caillouette v. Hercules</u>, evincing a disinclination to reconsider the Court of Appeals of New Mexico's decision in <u>Caillouette v. Hercules</u>. <u>See</u> <u>Caillouette v. Archibeque</u>, No. 20,355, 826 P.2d 573 (1992)(unpublished table decision).

classification of a prison inmate, see Archibeque v. Moya, 1993-NMSC-079 ¶¶ 9-12, 866 P.2d at 348.

Although negligent supervision alone is not enough to trigger the § 41-4-6 waiver, "a claim that involves elements of negligent supervision can still fall under the waiver if that supervision is directly tied to the operation . . . of the building." Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 16, 141 P.3d at 1263. See Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶¶ 3-4, 940 P.2d 459, 467;[21] Romero v. State, 1991-NMSC-071 ¶ 9, 815 P.2d 628, 630 (the Highway Department's maintenance responsibilities included "supervising the county's actual day-to-day maintenance of the roadway."), receded from on other grounds by Dunleavy v. Miller, 1993-NMSC-059, 862 P.2d 1212. In Leitheid v. City of Santa Fe, city pool lifeguards failed to ask for children's ages and heights, although pool regulations required adult supervision for children younger than seven and shorter than forty-eight inches. See Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶ 2, 940 P.2d at 460-61. The Court of Appeals of New Mexico found that when the "lifeguards did not adequately perform duties that were essential to public safety, they

---

[21]If presented with the issue, the Court predicts that the Supreme Court of New Mexico would agree with the reasoning of the Court of Appeals of New Mexico in Leitheid v. City of Santa Fe, in which the Court of Appeals of New Mexico concluded that the City's failure to provide adequate lifeguard supervision constituted negligent operation of a swimming pool, because the City's negligence created a "dangerous condition on the physical premises which affects the swimming public at large." Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶ 15, 940 P.2d at 463. In Seal v. Carlsbad Independent School District, 1993-NMSC-049 ¶¶ 10-11, 860 P.2d 743, 746, the Supreme Court of New Mexico suggested that, by not providing lifeguards, a school district may have waived immunity because its negligence caused an unsafe, dangerous, or defective condition on property owned and operated by the government. See 1993-NMSC-049 ¶¶ 10-11, 860 P.2d at 746. In Espinoza v. Town of Taos, the Supreme Court of New Mexico cited to Seal v. Carlsbad Independent School District as an example of a case under § 41-4-6 concerning negligent conduct that itself created an unsafe condition for the public, permitting a waiver of immunity. See Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 14, 905 P.2d at 722.

negligently operated the swimming pool and thereby created a condition on the premises that was dangerous to [the child] and the general public." Leitheid v. City of Santa Fe, 1997-NMCA-041 ¶ 12, 940 P.2d at 462.  The school's conduct in Upton v. Clovis Municipal School District went beyond negligent supervision, because: "(i) the school ignored information that the plaintiffs provided them; (ii) the school failed to warn the substitute teacher about the student's condition; and (iii) the school failed to follow through with the proper emergency procedures." C.H. v. Los Lunas Schools Bd. of Educ., 852 F. Supp. 2d at 1353 (citing Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 18, 141 P.3d at 126).  In Rave v. Board of Commissioners for the County of Bernalillo, 2017 WL 3600452, at *10, Judge Brack found that § 41-4-6's waiver applied where "the County's employees ignored information [plaintiff] gave them about his medical condition, failed to staff the facility or manage or train its employees to render aid to inmates with medical conditions, and failed to follow through with and/or enforce its policies related to inmates with medical issues." Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10.

In the prison context, the Supreme Court of New Mexico has held that "[t]he 'operation' and 'maintenance' of the penitentiary premises, as these terms are used in [§] 41-4-6, does not include the security, custody, and classification of inmates. . . .  Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions." Archibeque v. Moya, 1993-NMSC-079 ¶ 8, 866 P.2d at 347 (citations omitted).  In Archibeque v. Moya, Chris Archibeque, an inmate at the Central New Mexico Correction Facility, was transferred to the New Mexico State Penitentiary in Santa Fe, New Mexico. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Before being released into general population, a prison intake officer, Moya-Martinez, met with Archibeque to discuss whether he had any known enemies within the prison's general population.  See 1993-NMSC-079 ¶ 2, 866 P.2d at 346.  Archibeque

informed Moya-Martinez that another inmate, Gallegos, was one of his enemies, and Moya-Martinez, without checking an available list of current inmates, informed Archibeque that Gallegos was no longer at the prison. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Archibeque was released into general population, and Gallegos assaulted him that night. See 1993-NMSC-079 ¶ 2, 866 P.2d at 346. Archibeque sued Moya-Martinez, other corrections officers, and the New Mexico Department of Corrections in federal court for violations under 42 U.S.C. § 1983 and the NMTCA. See 1993-NMSC-079 ¶ 3, 866 P.2d at 346. The district court interpreted § 41-4-6 narrowly and held that the statute did not waive immunity for negligent security and custody of inmates at the penitentiary. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. Thereafter, Archibeque's § 1983 claims were resolved in favor of Moya-Martinez and the other corrections employees. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. The federal district court denied Archibeque's motion for reconsideration. See 1993-NMSC-079 ¶ 4, 866 P.2d at 346. Archibeque appealed, and the Tenth Circuit certified a question to the Supreme Court of New Mexico:

> Does [Section 41-4-6] of the New Mexico Tort Claims Act, [NMTCA Sections 41-4-1 to -29], provide immunity from tort liability to an employee of the state penitentiary whose alleged negligence in releasing a prisoner into the general prison population, which included known enemies of the prisoner, resulted in the prisoner being beaten and injured by one of his enemies?

See 1993-NMSC-079 ¶ 1, 866 P.2d at 345-46. Archibeque argued that Moya-Martinez was participating in the operation of the penitentiary when she classified Archibeque as an inmate who could safely be released into the general prison population, and he argued that Moya-Martinez's alleged negligence in misclassifying him and releasing him into the general population constituted negligent operation of the penitentiary, thereby waiving immunity under § 41-4-6. See 1993-NMSC-079 ¶ 5, 866 P.2d at 346-47. The Supreme Court of New Mexico found that § 41-4-6 did not waive Moya-Martinez' immunity, stating: "The 'operation' and 'maintenance' of

the penitentiary premises, as these terms are used in Section 41-4-6, does not include the security, custody, and classification of inmates." See 1993-NMSC-079 ¶ 8, 866 P.2d at 347 (quoting N.M. Stat. Ann. § 41-4-6). The Supreme Court of New Mexico reasoned that Moya-Martinez was not operating and maintaining the prison's physical premises when she negligently classified Archibeque.

> Rather, she was performing an administrative function associated with the operation of the corrections system. Section 41-4-6 does not waive immunity when public employees negligently perform such administrative functions. To read Section 41-4-6 as waiving immunity for negligent performance of administrative functions would be contrary to the plain language and intended purpose of the statute. See State v. Riddall, 112 N.M. 78, 80, 811 P.2d 576, 578 (Ct. App.)(stating that when interpreting a statute, an appellate court is required to consider the plain meaning of the words used and the intended purpose of the statute), cert. denied, 112 N.M. 21, 810 P.2d 1241 (1991).

1993-NMSC-079 ¶ 8, 866 P.2d at 347. The Supreme Court of New Mexico further explained:

> While Moya-Martinez's misclassification of Archibeque put him at risk, the negligence did not create an unsafe condition on the prison premises as to the general prison population. Reading Section 41-4-6 to waive immunity every time a public employee's negligence creates a risk of harm for a single individual would subvert the purpose of the Tort Claims Act, which recognizes that government, acting for the public good, "should not have the duty to do everything that might be done," and limits government liability accordingly. See Section 41-4-2(A).

1993-NMSC-079 ¶ 11, 866 P.2d at 348. According to the Supreme Court of New Mexico, to permit a waiver of immunity under § 41-4-6 whenever injury results from a negligently performed administrative task "would undermine the purpose of the Tort Claims Act by subjecting the State to liability for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." 1993-NMSC-079 ¶ 14, 866 P.2d at 349. Chief Justice Ransom stated that, whereas a "discrete administrative decision" does not waive immunity, a "general condition of unreasonable risk from negligent security practices" could waive immunity. Lymon

v. Aramark Corp., 728 F. Supp. 2d at 1266 (quoting Archibeque v. Moya, 1993-NMSC-079 ¶ 16, 866 P.2d at 349 (Ransom, C.J., concurring)).

The Court has concluded that Chief Justice Ransom determined that § 41-4-6 applies when alleged negligence changes the condition of the premises in question, and when the plaintiff's injuries arise from the premises' condition. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. In the context of inmate misclassification claims, the Court has concluded that a conclusory allegation that one inmate's misclassification created a danger for the inmate population could not support finding a waiver under § 41-4-6, and found that, to come within Chief Justice Ransom's footnote, inmate misclassification -- allegedly performed negligently -- must raise security risks, not health risks. See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266. "The Court is reluctant to expand Chief Justice Ransom's possible exception to other areas beyond prison security." Lymon v. Aramark Corp., 728 F. Supp. 2d at 1266-67.

New Mexico caselaw after Archibeque v. Moya suggests that, for negligent supervision, operation, or security practices to constitute negligent operation and maintenance, the negligent condition created must threaten the safety of the public or of a class of users -- not merely one individual. In Archibeque v. Moya, the Supreme Court of New Mexico noted that, "[w]hile a segment of the population at risk might justify waiver of immunity under Section 41-4-6, a situation in which a single inmate is put at risk is not comparable." 1993-NMSC-079 ¶ 14 n.3, 866 P.2d at 349 n.3. Chief Justice Ransom's concurring opinion noted:

> I concur because there was no showing that the general prison population reflected anything but the reasonable and expected risks of prison life. The classification of Archibeque did not change the condition of the premises. I see Archibeque's injuries as having been proximately caused by a discrete administrative decision. As an alternative to releasing Archibeque into the general population, he could have been placed in administrative segregation, a form of protective custody. The risk arose not from a condition of the premises

(as with the wild dogs in <u>Castillo</u> or, arguably, the inadequate health care facilities in <u>Silva</u> [v. State, 1987-NMSC-107, 745 P.2d 380]); it arose from the classification itself.

1993-NMSC-079 ¶ 17, 866 P.2d at 350 (Ransom, C.J., concurring).  After <u>Archibeque v. Moya</u>, the Supreme Court of New Mexico clarified that, for § 41-4-6's waiver to apply, the question is not whether the alleged negligence created an actual risk of harm for only a single individual, but rather whether the alleged negligence created a condition that poses a potential risk to the general public or to a class of people using the premises in question.  See <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.

In <u>Leitheid v. City of Santa Fe</u>, the Court of Appeals of New Mexico determined that the plaintiffs' claim was not merely negligent supervision, but rather negligent operation, creating a dangerous condition with a potential risk for more than just a single individual.  See <u>Leitheid v. City of Santa Fe</u>, 1997-NMCA-041 ¶ 5, 940 P.2d at 467.  In <u>Upton v. Clovis Municipal School District</u>, the Supreme Court of New Mexico held that, "[i]f the only alleged misconduct toward Sarah had been the substitute P.E. teacher failing to watch her while she participated in physical exercise, the Upton's claim . . . would be practically identical to the single claim of negligent supervision we found inadequate in <u>Espinoza</u>."  <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040-¶ 21, 141 P.3d at 1264.  In <u>Espinoza v. Town of Taos</u>, the Supreme Court of New Mexico concluded that, for § 41-4-6's waiver to apply, "the critical question is whether the condition creates a potential risk to the general public."  1995-NMSC-070 ¶ 9, 905 P.2d at 683.  Section 41-4-6's waiver may also apply if the negligent operation or maintenance creates a dangerous condition that threaten "a class of users of the building."  <u>Upton v. Clovis Mun. Sch. Dist.</u>, 2006-NMSC-040 ¶ 8, 141 P.3d at 1261.  See <u>Rave v. Bd. of Comm'rs for Cty. of Bernalillo</u>, 2017 WL 3600452, at *10 (defining the class of building users as "incarcerated inmates with

medical issues."); Castillo v. Cty. of Santa Fe, 1988-NMSC-037 ¶ 9, 755 P.2d at 51 (holding that, "[g]iven the potential for the safety of Valle Vista residents and invitees to be compromised by this situation, we find that, under the right circumstances, loose-running dogs could represent an unsafe condition upon the land").

New Mexico courts have also required that, for § 41-4-6's waiver to apply, the public employees knew or should have known of the danger posed by the condition. In Callaway v. New Mexico Department of Corrections, 1994-NMCA-049 ¶ 19, 875 P.2d at 399,[22] the Court of Appeals of New Mexico held that the New Mexico Department of Corrections "knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 1994-NMCA-049 ¶ 19, 875 P.2d at 399. The Court of Appeals of New Mexico additionally noted, in "support for [its] holding[,]" that the "inmate assailant was unusually dangerous and the prison authorities had knowledge of the danger posed by the inmate." 1994-NMCA-049, ¶ 19, 875 P.2d at 399 (alterations added). See Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251-56; C.H. v. Los

_____

[22]The Court predicts that the Supreme Court of New Mexico agrees with the Court of Appeals of New Mexico in Callaway v. New Mexico Department of Corrections that § 41-4-6's waiver applies where a prison knew certain inmates were dangerous and failed to supervise them, based on the Supreme Court of New Mexico's favorable citations to Callaway v. N.M. Dep't of Corr. See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045 ¶ 10, 310 P.3d at 616 ("A prison creates a dangerous condition by allowing known gang members to congregate in a recreation room that is shielded from observation by guards. Callaway, 1994-NMCA-049, ¶¶ 4, 19, 117 N.M. 637, 875 P.2d 393."); Upton v. Clovis Mun. Sch. Dist., 2006-NMSC-040 ¶ 23, 141 P.3d at 1264 (citing Callaway v. New Mexico Department of Corrections for the assertion that, for § 41-4-6's purposes, a condition must be at least potentially dangerous to the particular class of people using a building or facility in question, rather than actually dangerous to the entire public); Espinoza v. Town of Taos, 1995-NMSC-070 ¶ 13, 905 P.2d at 722 (discussing Callaway v. N.M. Dep't of Corr. and quoting the Court of Appeals of New Mexico's findings).

Lunas Sch. Bd. of Educ., 852 F. Supp. 2d at 1358-59 (holding that allegations of negligence against the defendants fell within the § 41-4-6 waiver, in part, because the plaintiff "adequately allege[d] that the defendants knew or should have known of the dangerous condition").

The Court has also addressed waiver of NMTCA immunity under § 41-4-6 in several other opinions. In <u>Stark-Romero v. National Railroad Passenger Co. (AMTRAK)</u>, 805 F. Supp. 2d 1145 (D.N.M. 2011)(Browning, J.), the Court held that immunity was not waived under § 41-4-6 for the plaintiffs' ingress and egress from a waste transfer facility, because, although New Mexico is liberal in protecting people traveling on public land, such a duty would be without limits. <u>See</u> 805 F. Supp. 2d at 1177. The Court found that the plaintiffs' injuries, in that case, did not arise from an unsafe, dangerous, or defective condition of the defendant's property. <u>See</u> <u>Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK)</u>, 805 F. Supp. 2d at 1182. In <u>Trujillo v. Salazar</u>, No. CIV 04-0689 JB/WDS, 2006 WL 1228827 (D.N.M. March 1, 2006)(Browning, J.), the Court found that immunity was not waived under § 41-4-6, because "the gravamen of the negligent operation claim against Salazar was not that Salazar himself ha[d] committed negligence by showing up to work every day, but that [the Central New Mexico Correctional Facility ("CNMCF")] negligently operated the facility by allowing Salazar to continue working at the facility." 2006 WL 1228827, at *9 (emphasis omitted). The Court further held that, "[t]o the extent that Trujillo may be arguing that Salazar negligently operated CNMCF by carrying on his employment at CNMCF after the first two alleged incidents, his decision to persist in his job was not a condition on the premises." <u>Trujillo v. Salazar</u>, 2006 WL 1228827, at *9. In <u>Williams v. Board of Regents of University of New Mexico</u>, 20 F. Supp. 3d 1177, 1195 (D.N.M. 2014)(Browning, J.), the Court concluded that a claim brought under § 41-4-6 on the basis of negligent misclassification of an inmate would likely fail if the alleged negligence only exposed a plaintiff to health risks, rather than security

risks.  The Court cited to <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1266, in which the Court

stated that, to fall within Chief Justice Ransom's concurrence in <u>Archibeque v. Moya</u>, a

misclassification "must raise security risks, not health risks."  <u>Lymon v. Aramark Corp.</u>, 728 F.

Supp. 2d at 1266.

## LAW REGARDING NMTCA § 41-4-9

Section 41-4-9 of the NMTCA provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA
> 1978 does not apply to liability for damages resulting from bodily injury,
> wrongful death or property damage caused by the negligence of public employees
> while acting within the scope of their duties in the operation of any hospital,
> infirmary, mental institution, clinic, dispensary, medical care home or like
> facilities.

N.M. Stat. Ann. § 41-4-9.  "Section 41-4-9 applies to the operation of facilities which provide

medical care directly to people."  <u>Redding v. City of Truth or Consequences</u>, 1984-NMCA-132

¶ 8, 693 P.2d 594, 596.[23]  The Court of Appeals of New Mexico found it significant that the New

---

[23]The Court believes that the Supreme Court of New Mexico is likely to agree with <u>Redding v. City of Truth or Consequences</u>, if presented with the issue.  Section 41-4-9's text lists the applicable facilities as "any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities."  N.M. Stat. Ann. § 41-4-9.  The Supreme Court of New Mexico declines to

> add words except where necessary to make the statute conform to the obvious
> intent of the legislature, or to prevent its being absurd.  <u>Morruzi v. Federal Life
> & Cas. Co.</u>, 42 N.M. 35, 75 P.2d 320, 115 A.L.R. 407.  But where the language
> of the legislative act is doubtful or an adherence to the literal use of words would
> lead to injustice, absurdity, or contradiction, the statute will be construed
> according to its obvious spirit or reason, even though this requires the rejection
> of words or the substitution of others.  <u>State v. Southern Pacific Co.</u>, 34 N.M. 306,
> 281 P.29; <u>Janney v. Fullroe</u>, 47 N.M. 423, 144 P.2d 145.

<u>State v. Nance</u>, 1966-NMSC-207 ¶ 16, 419 P.2d 242, 247, <u>abrogated on other grounds by</u> <u>State v. Wilson</u>, 2011-NMSC-001, 248 P.3d 315.  In <u>Begay v. State</u>, the Court of Appeals of New Mexico cited to <u>Redding v. City of Truth or Consequences</u> to support its conclusion that Office of the Medical Investigator is not a like facility as contemplated by § 41-4-9.  <u>See</u> <u>Begay v. State</u>, 1985-

Mexico Legislature did not use the word "maintenance" in § 41-4-9 and concluded "that the legislature chose to provide a more limited waiver for the activities of public employees in connection with a mental institution or clinic than it provided for other activities of public employees." Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 11, 775 P.2d at 1335.[24] The Court of Appeals of New Mexico stated that, for § 41-4-9's waiver to apply, the public employee in question must have been involved in clinical decision-making. See Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 12, 775 P.2d at 1335.

New Mexico courts have generally denied the application of § 41-4-9 and found immunity for the state government entity and employees when medical contractors operate the medical unit in question. See Lee v. McKinley Cty. Adult Det. Ctr., No. CIV 12-1124 MCA/LAM, 2014 WL 12788056, at *10 (D.N.M. Sept. 9, 2014)(Armijo, C.J.)(citing Lessen v. City of Albuquerque,

NMCA-117 ¶ 11, 723 P.2d at 256. The United States Court of Appeals for the Tenth Circuit noted that the Court of Appeals of New Mexico "refused in *Begay*[ v. State] to read 'the operation of the state medical investigator's office' into this exception. Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d 1114, 1117 (quoting Begay v. State, 1985-NMCA-117 ¶ 11, 723 P.2d at 256). Although this case was reversed by the New Mexico Supreme Court, the reversal was based on other grounds, and we believe that this decision provides sufficient evidence of how New Mexico's courts would rule on this issue." Ross v. Bd. of Regents of the Univ. of N.M., 599 F.3d at 1117. The Court agrees with the Tenth Circuit that the Supreme Court of New Mexico's reversal of Begay v. State on other grounds provides evidence of how it would rule on the issue of what facilities are "like facilities" pursuant to § 41-4-9, and considering Begay v. State adopted the reasoning of Redding v. City of Truth or Consequences, the Court predicts that the Supreme Court of New Mexico would agree with Redding v. City of Truth or Consequences on this issue.

[24]While the Court is reluctant to read too much into a failure to comment, the Court predicts the Supreme Court of New Mexico would, if presented with the issue, find that the New Mexico Legislature intended to provide a more limited waiver in § 41-4-9 by omitting the word "maintenance", and the Court bases its prediction, at least in part, on the fact that in the twenty-nine years since the Court of Appeals of New Mexico decided Armijo v. Department of Health and Environment, numerous Courts of Appeals decisions have relied on it, and the Supreme Court of New Mexico has never issued an opinion challenging its reasoning or ruling.

2008-NMCA-085 ¶ 31, 187 P.3d at 185 (holding that § 41-4-9 did not waive sovereign immunity for the City of Albuquerque, because a medical contractor operates the medical unit at the MDC)); Celaya v. Hall, 2004-NMSC-005, 85 P.3d 239 (recognizing that a governmental entity could not be held liable under the NMTCA for the alleged acts of an independent contractor)).  See also Kellum v. Bernalillo Cty., 2015 WL 12859577, at *10 (holding that § 41-4-9 was inapplicable to Bernalillo County because an independent contractor operates the medical unit at the MDC).

In Lee v. McKinley County Adult Detention Center, the Honorable M. Christina Armijo, then-Chief District Judge for the District of New Mexico, stated that, under New Mexico law, "a 'public employee' means an officer, employee or servant of a governmental entity, excluding independent contractors except for individuals defined in Paragraphs (7), (8), (10), (14) and (17) of this subsection."  Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10 (quoting N.M. Stat. Ann. § 41-4-3(F)).  Paragraph 7 of § 41-4-3(F) provides an exception to the definition of public employees for "licensed medical, psychological or dental arts practitioners providing services to the corrections department pursuant to contract."  N.M. Stat. Ann. § 41-4-3(F)(7).  In Lee v. McKinley County Adult Detention Center, Chief Judge Armijo concluded that the MDC "does not fall under the corrections department, and thus New Mexico has not waived immunity for the actions of [its medical contractor's] employees."  Lee v. McKinley Cty. Adult Det. Ctr., 2014 WL 12788056, at *10.  See N.M. Stat. Ann. § 33-3-1(A) ("The common jails shall be under the control of the respective sheriffs, independent contractors or jail administrators hired by the board of county commissioners or other local public body or combination thereof."); N.M. Stat. Ann. § 33-3-27(E) (requiring contractors "for the operation or provision and operation of jails" to assume all liability from the jails' provision and operation).

The Court of Appeals of New Mexico also has held, in the context of prison medical units, that "liability against a jail cannot be based on § 41-4-9 when the jail has contracted with a private entity to provide medical services."  Salazar v. San Juan Cty. Det. Ctr., No. CIV 15-0417 JB/LF, No. CIV 15-0439 JB/LF, No. CIV 15-0497 JB/LF, No. CIV 15-0526 JB/LF, 2016 WL 335447, at *49 (D.N.M. Jan. 15, 2016)(Browning, J.)(citing Lessen v. City of Albuquerque, 2008-NMCA-085, ¶¶ 28-30, 187 P.3d at 320).  The Court of Appeals of New Mexico explained:

> We agree with the general proposition stated in *Estelle* [v. Gamble, 429 U.S. 97 (1976)] and *Ancata* [v. Prison Health Servs., Inc., 769 F.2d 700 (11th Cir. 1985)] that governmental entities must provide appropriate medical care to persons they incarcerate.  *See Estelle*, 429 U.S. at 103; *Ancata*, 769 F.2d at 705.  Such governmental entities cannot escape that duty by contracting with third parties to provide the medical care, and a governmental entity "remains liable for any constitutional deprivations caused by the policies or customs of the [third party]."  *Ancata*, 769 F.2d at 705.  This is not to say, however, that a governmental entity's constitutional obligation equates with waiver of immunity for negligent operation of an infirmary under New Mexico's TCA.  If Plaintiff had alleged and could prove that the City's inadequate medical care deprived Decedent of a constitutional right, Plaintiff might be entitled to recover under the waiver of immunity provided in Section 41-4-12.  But, as discussed in the next section of this opinion, Plaintiff's allegations of conduct that is merely negligent are insufficient to establish such a constitutional violation.  *See Ancata*, 769 F.2d at 703 (indicating that claim of constitutional deprivation in the context of inadequate medical care requires a showing of "deliberate indifference to serious medical needs").

Lessen v. City of Albuquerque, 2008 NMCA-085 ¶¶ 30-31, 187 P.3d at 320. See Morrissey v. Ulibarri, 08-cv-246 WJ/RHS, 2010 WL 11470879, *5 & n.3 (D.N.M. April 28, 2010)(Johnson, J.)(concluding that a plaintiff cannot sue a correctional facility's wardens under § 41-4-9 for preventing an inmate from receiving medication, properly maintaining his colostomy bag, attending critical chemotherapy appointments, and receiving follow-up surgery in a timely manner -- without presenting some evidence at the summary judgment stage that the wardens had supervisory power over the privately-run medical facility).  No state or federal case in New Mexico

has held that the § 41-4-9 immunity waiver applies when an independent contractor operates the medical facility in question. See, e.g., Rave v. Bd. of Comm'rs for the Cty. of Bernalillo, 2017 WL 3600452, at *10-11; Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *49; Kellum v. Bernalillo Cty., 2015 WL 12859577, at *10.

That a contractor operates a medical facility is not necessarily dispositive of the immunity waiver issue as to all non-contractor entities and personnel who might be involved in the operation of that medical facility. See, e.g., Silva v. State, 1987-NMSC-107 ¶ 9, 745 P.2d at 385 (concluding that § 41-4-9's waiver is arguably applicable to the Secretary of Corrections, if the factfinder determines he failed to exercise ordinary care in the discharge of duties found to include the operation or maintenance of healthcare facilities inside the prison). For a non-contractor person or entity to be liable, the claims against them must relate to the actual medical care -- and specifically, to the clinical decision-making or supervision of clinical decision-making -- at the medical unit in question. See Armijo v. Dep't of Health and Env., 1989-NMCA-043, at ¶ 13, 775 P.2d at 1335 (determining that § 41-4-9 could not apply for the plaintiff's negligence claims against the Health and Environment Department ("HED"), because the HED did not regulate the clinical decision-making at the mental health facility, and therefore did not operate the facility within § 41-4-9's meaning); Reese v. Bd. of Cty. Comm'rs of the Cty. of Bernalillo, CIV No. 10-1247 LH/RHS, 2012 WL 13076227, at *7 (D.N.M. Sept. 18, 2012)(Hansen, J.)("Plaintiff's allegations against Defendant Torres and Defendant County relate to their management of the grievance system rather than the actual medical treatment received by inmates at the infirmary. As such, § 41-4-9 does not operate to waive immunity . . . ."); Gallegos v. Trujillo, 1992-NMCA-090 ¶ 18, 839 P.2d 645, 649 ("In Armijo we held that an agency's regulation of a

mental health facility was not "operation" of the mental health facility where the agency was not involved in the actual clinical decision-making . . . .").[25]

## LAW REGARDING NMTCA § 41-4-12

Section 41-4-12 of the NMTCA provides a waiver of immunity for certain torts committed by law enforcement officers and for negligence that causes a specified tort. See Caillouette v. Hercules, Inc., 1992-NMSC-008 ¶ 18, 827 P.2d at 1311); Oliveros v. Mitchell, 449 F.3d 1091, 1096 (10th Cir. 2006)(citing Methola v. Cty. of Eddy, 1980-NMSC-145 ¶ 23, 622 P.2d 234, 238;. Section 41-4-12 provides:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.

> Thus, in order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties, and that the plaintiff's injuries arose out of either a tort enumerated in this section or a deprivation of a right secured by law.

Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't, 1996-NMSC-021 ¶ 7, 916 P.2d at 1316.

A law enforcement officer is a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when

---

[25]The Court believes the Supreme Court of New Mexico, if presented with the issue, would agree with the Court of Appeals of New Mexico's decision in Gallegos v. Trujillo.  See supra n.27.

called to active duty by the governor." N.M. Stat. Ann. § 41-4-3. "New Mexico courts have construed this definition strictly." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-633, 2009 U.S. Dist. LEXIS 47154, at *10 (D.N.M. April 20, 2009)(Browning, J.). See, e.g., Montes v. Gallegos, 812 F. Supp. 1165, 1172 (D.N.M. 1992)(Parker, J.)(holding that the mayor is not a law enforcement officer under the NMTCA, notwithstanding his statutory authority and obligation to exercise law enforcement functions); Dunn v. McFeeley, 1999-NMCA-084 ¶ 25, 984 P.2d 760, 767 (holding that the Office of the Medical Investigator's Medical Investigator and the crime laboratory technician are not law enforcement officers under the NMTCA), cert. denied, No. 25,764, 981 P.2d 1207 (1999);[26] Coyazo v. State, 1995-NMCA-056 ¶ 20, 897 P.2d 234, 238 (holding that the public defender and his staff are not law enforcement officers under § 41-4-3(D)); Callaway v. N.M. Dep't of Corr., 1994-NMCA-049 ¶¶ 11-12, 875 P.2d at 397 (holding that correctional officers at a penitentiary are not law enforcement officers under the NMTCA,

---

[26]The Court predicts that the Supreme Court of New Mexico, if presented with the issue, would agree with the result in Dunn v. McFeeley that the Office of the Medical Investigator's Medical Investigator and the crime laboratory technician in Dunn v. McFeeley are not law-enforcement officers under the NMTCA. Section 41-4-3 states that a law-enforcement officer's principal duties under law are to hold persons accused of a criminal offense in custody, to maintain public order or make arrests, or are members of the national guard when the governor calls them to active duty. See N.M. Stat. Ann. § 41-4-3. In Chavez-Rodriguez v. City of Santa Fe, the Court stated that New Mexico courts construe the § 41-4-3 definition strictly. See 2009 U.S. Dist. LEXIS 47154, at *10. The Court of Appeals of New Mexico concluded that the complaint contained no allegations that the principal duties of the medical investigator and crime scene technician related to law enforcement. See Dunn v. McFeeley, 1999-NMCA-084 ¶¶ 24-25, 984 P.2d 760, 767. Furthermore, in Begay v. State, the Court of Appeals of New Mexico concluded that a medical investigator is not a law-enforcement officer and the Supreme Court of New Mexico did not alter that determination when it reversed Begay v. State on other grounds. See Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306. Although the Court is reluctant to read too much into a denial of a petition for certiorari, the Supreme Court of New Mexico did deny the petition from Dunn v. McFeeley, suggesting a disinclination to reconsider the Court of Appeals of New Mexico's decision.

notwithstanding their statutory power to make arrests);[27] <u>Vigil v. Martinez</u>, 1992-NMCA-033 ¶ 20,

832 P.2d 405, 412 (holding that probation and parole officers are not law enforcement officers

---

[27]While the Court is reluctant to read too much into a denial of a petition of certiorari, the Court predicts that the Supreme Court of New Mexico would, if presented with the issue, conclude that corrections officers are not law-enforcement officers under the NMTCA, and the Court bases its prediction, at least in part, on the fact that the Supreme Court of New Mexico denied the petition for certiorari in <u>Callaway v. New Mexico Department of Corrections</u>. <u>See</u> <u>Callaway v. N.M. Dep't of Corr.</u>, 879 P.2d 91 (unpublished table decision)(denying certiorari). The Court discussed <u>Callaway v. New Mexico Department of Corrections</u> in <u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1255-56.

     In <u>Anchondo v. Corrections Department</u>, the Supreme Court of New Mexico received a certified question from the Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, asking; "Are the Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe 'law enforcement officers within the meaning of Section 41-4-3(D), NMSA 1978?" 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico found that the Secretary of Corrections and the Warden are not law-enforcement officers. <u>See</u> 100 N.M. at 109, 666 P.2d at 1256. The Supreme Court of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of Corrections nor the Warden engage in any of the traditional duties of "law enforcement officers." They do not deal directly with the daily custodial care of prison inmates. Moreover, because they do not have commissions, they have no power to make arrests or to take people into custody should a violation of the public order occur. They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system.

100 N.M. at 109-10, 666 P.2d at 1256-57. "To determine whether positions are of a law enforcement nature, this Court will look at the character of the principal duties involved, those duties to which employees devote the majority of their time." <u>Anchondo v. Corr. Dep't</u>, 100 N.M. at 110, 555 P.2d at 1257.

<u>Lymon v. Aramark Corp.</u>, 728 F. Supp. 2d at 1255-56. In <u>Callaway v. New Mexico Department of Corrections</u>, the Court of Appeals of New Mexico referenced the statutory duties of prison guards as set forth in N.M. Stat. Ann. § 33-2-15:

> The employees of the penitentiary shall perform such duties in the charge and oversight of the penitentiary, care of the property belonging thereto, and in the

under the NMTCA);[28] <u>Anchondo v. Corr. Dep't</u>, 1983-NMSC-051 ¶ 14, 666 P.2d 1255, 1258

(holding that the Secretary of Corrections and the Warden of a state penitentiary are not law

---

> custody, government, employment and discipline of the convicts as shall be
> required of them by the corrections division [corrections department] or the
> warden, in conformity with law and rules and regulations prescribed for the
> government of the penitentiary.

<u>Callaway v. N.M. Dep't of Corr.</u>, 1994-NMCA-049 ¶ 10, 875 P.2d at 397 (internal quotation marks
omitted)(quoting N.M. Stat. Ann. § 33-2-15). The principal statutory duties of corrections officers,
pursuant to § 33-2-15, are supervisory, administrative, and custodial, but they do not "hold in
custody any person accused of a criminal offense, to maintain public order or to make arrests for
crimes, or members of the national guard when called to active duty by the governor." N.M. Stat.
Ann. § 41-4-3. Although corrections officers do hold in custody persons who have already been
convicted, § 41-4-3 specifies that a law-enforcement officer "hold[s] in custody any person
accused of a criminal offense." N.M. Stat. Ann. § 41-4-3.

[28]The Court predicts that the Supreme Court of New Mexico, if presented with the issue,
would agree with <u>Vigil v. Martinez</u> that probation and parole officers are not law-enforcement
officers under the NMTCA. The Court of Appeals of New Mexico explained in <u>Rayos v. State ex
rel. New Mexico Department of Corrections, Adult Probation and Parole Division</u>:

> In the more than twenty years since <u>Vigil</u> was decided, the New Mexico
> Legislature has not amended the statute to include probation and parole officers
> within the definition of law enforcement officers. Moreover, every subsequent
> state and federal decision -- both published and unpublished -- on the "law
> enforcement officer" waiver has followed *Vigil*, albeit with little meaningful
> analysis or none at all. <u>See</u>, <u>e.g.</u>, *Limacher*, 2008-NMCA-163, ¶ 17, 145 N.M.
> 344, 198 P.3d 370; *Coyazo*, 1995-NMCA-056, ¶ 17, 120 N.M. 47, 897 P.2d 234;
> *Trask v. Franco*, 446 F.3d 1036, 1048 (10th Cir. 2006); *Ricks v. N.M. Adult Prob.
> & Parole Dep't*, No. CV-11-608, slip op. at 32-33 (D.N.M. Aug. 9, 2012); *Wells
> v. N.M. Adult Prob. & Parole*, No. CV-09-150, slip op. at 3 (D.N.M. Feb. 5,
> 2010); *Kenney v. New Mexico*, No. CV-07-0422, slip op. at 8 (D.N.M. Oct. 2,
> 2007). Against this backdrop, there simply has been no change in the law to
> warrant a departure from *Vigil*. *See Trujillo v. City of Albuquerque*, 1998-NMSC-
> 031, ¶ 34, 125 N.M. 721, 965 P.2d 305 (noting, in relevant part, that before
> overturning precedent, we must consider "whether the principles of law have
> developed to such an extent as to leave the old rule no more than a remnant of
> abandoned doctrine" and "whether the facts have changed in the interval from the
> old rule to reconsideration so as to have robbed the old rule of justification"
> (internal quotation marks and citation omitted)). Thus, our sole task here is to
> determine whether the facts have so changed that the principal duties of probation

enforcement officers under the NMTCA).  See also Johnson v. Holmes, 377 F. Supp. 2d 1069,

1083 (D.N.M. 2004)(Browning, J.)("Akin to a law enforcement officer is, as a matter of law,

insufficient to waive sovereign immunity under § 41-4-12 NMSA 1978."), aff'd, 455 F.3d 1133

(10th Cir. 2006).

The New Mexico Court of Appeals has held that corrections officers who hold convicted

persons in custody are not law enforcement officers under § 41-4-3(D), which defines law

enforcement officer as used in § 41-4-12.  See Callaway v. N.M. Dep't of Corr., 1994-NMSC-049

¶ 12, 875 P.2d at 397 (stating "we affirm the trial court's determination that corrections officers

are not law enforcement officers under Section 41-4-3(D)").  In Anchondo v. Corrections

Department, the Supreme Court of New Mexico received a certified question from the Honorable

Juan G. Burciaga, United States District Judge for the District of New Mexico, asking: "Are the

Secretary of Corrections and the Warden of the State Penitentiary in Santa Fe

'law enforcement officers' within the meaning of Section 41-4-3(D), NMSA 1978?"

1983-NMSC-051 ¶ 1, 666 P.2d at 1255.  The Supreme Court of New Mexico found that the

Secretary of Corrections and the Warden are not law enforcement officers.

See 1983-NMSC-051 ¶ 7, 666 P.2d at 1256.  The Supreme Court of New Mexico explained:

> From looking at the statutes, we see that neither the Secretary of Corrections
> nor the Warden engage in any of the traditional duties of "law enforcement
> officers."  They do not deal directly with the daily custodial care of prison inmates.
> Moreover, because they do not have commissions, they have no power to make
> arrests or to take people into custody should a violation of the public order occur.

_____

and parole officers now fall within one of the three relevant categories of principal
duties of law enforcement officers enumerated in Section 41-4-3(D) of the TCA.

Rayos v. State ex rel. N.M. Dep't of Corr., Adult Prob. and Parole Div., 2014-NMCA-103 ¶ 11,
336 P.3d 428, 432, cert. denied, Rayos v. State, 2014-NMCERT-010, 339 P.3d 426 (Table), cert.
quashed, Rayos v. State, 2015-NMCERT-007, 368 P.3d 2 (Table).

They are merely administrative officers appointed by the governor to oversee, administer, and supervise the state's corrections system.

Anchondo v. Corr. Dep't, 1983-NMSC-051 ¶ 7, 666 P.2d at 1256.

## **LAW REGARDING 42 U.S.C. § 1983 CLAIMS**

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))). Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. Consequently, there is no respondeat superior liability under § 1983. See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[29] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their

---

[29]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court of the United States held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389. Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights. See Bivens, 403 U.S. at 389. See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is <u>Rizzo v. Goode</u>, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed. <u>See</u> <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo v. Goode</u>, 423 U.S. at 371). The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'" <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo v. Goode</u>, 423 U.S. at 371).

## LAW REGARDING PUNITIVE DAMAGES

A chronology of the Supreme Court's and the United States Court of Appeals for the Tenth Circuit's caselaw on the constitutional limitations on punitive damages reveals an increasingly restrictive view of punitive damages awards that greatly exceed compensatory damages. The Court cannot, as a district court that must faithfully follow controlling constitutional cases, say that the Supreme Court has replaced the guideposts in <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559 (1996), for constitutional analysis with the bright-line test in <u>Exxon Shipping Co. v. Baker</u>, 554 U.S. 471 (2008), which is now used in maritime cases, but even the Supreme Court's opinion in <u>State Farm Mutual Automobile Insurance Co. v. Campbell</u>, 538 U.S. 408 (2003), states that "[w]hen compensatory damages are substantial, then a lesser ratio [of punitive to compensatory], <u>perhaps only equal to compensatory damages</u>, can reach the outermost limit of the due process guarantee." 538 U.S. at 425 (emphasis added). Coupled with the analysis of <u>Exxon Shipping Co. v. Baker</u>, which remains instructive, even if not controlling in constitutional cases, it may be difficult to justify under the Due Process Clause more than a one to one ratio in cases involving substantial compensatory, purely economic damages.

1.    **The Caselaw from the Supreme Court and the Tenth Circuit Concerning Punitive Damages**.

In <u>Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.</u>, 492 U.S. 257, 262 (1989), the Supreme Court held that the Excessive Fines Clause of the Eighth Amendment to the Constitution does not apply to a punitive damages award in a civil case between private parties. <u>See</u> 492 U.S. at 262 (noting that "our cases long have understood [the Eighth Amendment] to apply primarily, and perhaps exclusively, to criminal prosecutions and punishments."). The Supreme Court held that,

> even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment.

492 U.S. at 275. Although it ultimately declined to review the punitive damages award in <u>Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.</u> under the Due Process Clause of the Fourteenth Amendment to the Constitution, the Supreme Court nonetheless noted: "There is some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme." <u>Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.</u>, 492 U.S. at 277. Although only five justices joined in all parts of the majority opinion in <u>Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.</u>, all nine justices concurred that the Due Process Clause might be used in future cases to limit punitive damages awards. <u>See</u> <u>Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.</u>, 492 U.S. at 280-282 (Brennan, J., concurring in part, joined by Marshall, J.)("I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties."); <u>Browning-Ferris Indus.</u>

of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 282-283 (O'Connor, J., concurring in part, joined by Stevens, J.)("[N]othing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed . . . .").  In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court confronted the questions whether and to what extent the Due Process Clause might limit punitive damages awards in civil cases between private litigants.  See 499 U.S. at 15.  The Supreme Court held:

> One must concede that unlimited jury discretion -- or unlimited judicial discretion for that matter -- in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities.  We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.  We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus.  With these concerns in mind, we review the constitutionality of the punitive damages awarded in this case.

499 U.S. at 18-19 (internal citations omitted).  The underlying facts of Pacific Mutual Life Insurance Co. v. Haslip centered on a life insurance agent for Pacific Mutual Insurance Company who sold life insurance to a number of employees of an Alabama municipality.  See 499 U.S. at 4. Although the insureds' employer paid the insureds' premiums to the insurance agent, he misappropriated most of the funds and failed to forward notices of lapsed coverage to the insureds. See 499 U.S. at 5.  The insureds sued both the insurance agent and Pacific Mutual Insurance Company, and the jury awarded $1,040,000.00 in total damages to plaintiff Cleopatra Haslip, including $4,000.00 in out-of-pocket expenditures and compensatory damages of $200,000.00. See 499 U.S. at 6 n.2.  Recognizing that the district court had adequately instructed the jury and that the appellate courts had properly analyzed the verdict for excessiveness, the Supreme Court ultimately held that the punitive damages award was constitutional.  See 499 U.S. at 19-23. Specifically, the Supreme Court found:

We are aware that the punitive damages award in this case is more than 4 times the amount of compensatory damages, is more than 200 times the out-of-pocket expenses of respondent Haslip and, of course, is much in excess of the fine that could be imposed for insurance fraud under Ala. Code §§ 13A-5-11 and 13A-5-12(a) (1982), and Ala. Code §§ 27-1-12, 27-12-17, and 27-12-23 (1986). Imprisonment, however, could also be required of an individual in the criminal context. While the monetary comparisons are wide and, indeed, may be close to the line, the award here did not lack objective criteria. We conclude, after careful consideration, that in this case it does not cross the line into the area of constitutional impropriety. Accordingly, Pacific Mutual's due process challenge must be, and is, rejected.

499 U.S. at 23-24.

The Supreme Court affirmed a punitive damage award of ten million dollars in its next punitive damages case. See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 446 (1993). The jury in TXO Production Corp. v. Alliance Resources Corp. awarded compensatory damages of only $19,000.00. See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 446. In the plurality opinion, Justice Stevens, joined by Chief Justice Rehnquist and Justice Blackmun, emphasized that the potential harm from the defendant's conduct went beyond the damage that actually occurred: "It is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to the other victims that might have resulted if similar future behavior were not deterred." TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 460-61 (emphasis original). The defendant, TXO Production Corp., was a large oil and gas company conducting business in twenty-five states, whereas the plaintiff, Alliance Resource Corp., was a smaller company that owned mineral rights in a tract of land that TXO Production considered potentially profitable. See 509 U.S. at 447. TXO Production made a deal with Alliance Resource to acquire its interest, subject to a provision that Alliance Resource would return the consideration TXO Production paid if TXO Production's attorneys found that Alliance Resource's title had failed. See 509 U.S. at 447-48.

Knowing that Alliance Resource's title was valid, TXO Production attempted to induce a third party to sign an affidavit stating otherwise, according to the Alliance Resources, so that TXO Production would not have to pay royalties on the oil-and-gas revenues generated on the property, pursuant to the parties' agreement.  See 509 U.S. at 449.  The jury was ultimately persuaded to agree with Alliance Resource, given its award.

Acknowledging "the shocking disparity between the punitive damage award and the compensatory award," Justice Stevens wrote:

> [T]he shock dissipates when one considers the potential loss to [Alliance Resources], in terms of reduced or eliminated royalties payments, had [TXO Production] succeeded in its illicit scheme.  Thus, even if the actual value of the "potential harm" to [Alliance Resource] is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, "jar one's constitutional sensibilities."

509 U.S. at 462 (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 18).  Noting Justice O'Connor's dissenting opinion, in which Justice White and Justice Souter joined, wherein she asserted the "plausible argument" that the sizeable punitive damage award "is explained by the jury's raw, redistributionist impulses stemming from antipathy to a wealthy, out-of-state, corporate defendant," TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468 (Kennedy, J., concurring), Justice Kennedy wrote:

> There is, however, another explanation for the jury verdict, one supported by the record and relied upon by the state courts, that persuades me that I cannot say with sufficient confidence that the award was unjustified or improper on this record: TXO acted with malice.  This was not a case of negligence, strict liability, or respondeat superior.  TXO was found to have committed, through its senior officers, the intentional tort of slander of title.  The evidence at trial demonstrated that it acted, in the West Virginia Supreme Court's words, through a "pattern and practice of fraud, trickery and deceit" and employed "unsavory and malicious practices" in the course of its business dealings with respondent.  "The record shows that this was not an isolated incident on TXO's part -- a mere excess of zeal

by poorly supervised, low level employees -- but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power."

TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468-69 (Kennedy, J., concurring)(internal citations omitted).

### a.    BMW of North America, Inc. v. Gore.

In BMW of North America, Inc. v. Gore, the Supreme Court found for the first time that a punitive damages award was unconstitutionally excessive and in violation of the Due Process Clause's substantive component.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 585-86.  Noting that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," the Supreme Court set forth three guideposts for lower courts to consider when determining the constitutionality of a punitive damages award. See BMW of N. Am., Inc. v. Gore, 517 U.S. at 574-75.  The BMW of North America, Inc. v. Gore guideposts are: (i) the reprehensibility of the defendant's conduct; (ii) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award;" and (iii) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. at 575.

The plaintiff in BMW of North America, Inc. v. Gore purchased a BMW automobile and later learned that the vehicle had been repainted after it was damaged before its delivery to the plaintiff.  See 517 U.S. at 562.  The manufacturer admitted it was company policy not to disclose such damage to new cars when the cost of repair was less than three percent of the car's suggested retail price. See 517 U.S. at 562.  In addition to compensatory damages in the amount of four-thousand dollars, the jury awarded punitive damages in the amount of four-million dollars. See

517 U.S. at 565. On appeal, the Supreme Court of Alabama remitted the punitive damages award to two-million dollars. <u>See</u> 517 U.S. at 567.

With regard to the first guidepost, the reprehensibility of the defendant's conduct, the Supreme Court held that "BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award." 517 U.S. at 580. Noting that "[t]he $2 million punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury," 517 U.S. at 582, the Supreme Court found the relationship between punitive and compensatory damages to be "breathtaking" and held that it "must surely 'raise a suspicious judicial eyebrow,'" 517 U.S. at 583. With regard to the third guidepost, the Supreme Court held that "the $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance." 517 U.S. at 584. Thus, the Supreme Court reversed and remanded the Supreme Court of Alabama's remitted amount. <u>See</u> 517 U.S. at 586.

In the first punitive damages case the Tenth Circuit considered after <u>BMW of North America, Inc. v. Gore</u>, the Tenth Circuit remitted a punitive damages award to an amount "approximately six times the actual and potential damages plaintiffs suffered." <u>Cont'l Trend Res., Inc. v. OXY USA, Inc.</u>, 101 F.3d 634, 643 (10th Cir. 1996)(reversing district court's denial of remittitur and reducing punitive damages award of $30 million to $6 million). A number of punitive damages decisions thereafter used the six to one ratio. <u>See</u> <u>United Phosphorous, Ltd. v. Midland Fumigant, Inc.</u>, 205 F.3d 1219, 1231 (10th Cir. 2000)(affirming as constitutional a punitive damages award of $653,217.00 where compensatory damages were $67,694.00, after noting that adding the plaintiff's lost profits to the compensatory damages would "bring[] the punitive to harm ratio down to less than 6:1"); <u>Fed. Deposit Ins. Corp. v. Hamilton</u>, 122 F.3d 854,

862 (10th Cir. 1997)("[W]e reverse the $1,200,000.00 punitive damage award entered by the district court, and order a remittitur to $264,000.00, an amount representing six times the actual damages suffered by the Hamiltons.").

On the other hand, also after BMW of North America, Inc. v. Gore, case law from the Tenth Circuit suggested that it would allow punitive to compensatory damages ratios of greater than ten to one. See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1230 (10th Cir. 2000)(noting that "the 10:1 ratio is not a sacred line in the sand, across which no punitive award may venture without feeling the wrath of an appellate court's constitutional sword"). Indeed, in some cases, the Tenth Circuit permitted punitive to compensatory ratios greater than ten to one. See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1272-73 (10th Cir. 2000)(holding that punitive damages award of $295,000.00 was not constitutionally excessive despite compensatory damages of only $5,000.00, because "both the Supreme Court and this court acknowledge that low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages"); Bielicki v. Terminix Int'l Co., 225 F.3d 1159, 1165 (10th Cir. 2000)(affirming as constitutional the district court's award of punitive damages where "[t]he ratio between the punitive damages and compensatory damages awarded by the jury is 12 to 1").

### b.     State Farm Mutual Automobile Insurance Co. v. Campbell.

The Supreme Court returned to the question of the constitutional limits on punitive damages in State Farm Mutual Automobile Insurance Co. v. Campbell, where the Supreme Court considered a bad-faith failure to settle claim brought by an insured against its insurer. See 538 U.S. at 412. The jury at the district-court level awarded one million dollars in compensatory damages and $145 million in punitive damages. See 538 U.S. at 412. The Supreme Court found

the question whether punitive damages were excessive to be "neither close nor difficult." 538 U.S. at 418. Although it found that "State Farm's handling of the claims against the Campbells merits no praise," 538 U.S. at 419, the Supreme Court found that the punitive damages award -- or at least the analysis of the first guidepost, reprehensibility -- was based more on State Farm's "nationwide policies than for the conduct directed toward the Campbells," 538 U.S. at 420. The Supreme Court declined to impose any bright-line ratio of punitive to compensatory damages under the second guidepost, but held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. With regard to the third guidepost, the Supreme Court found: "The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award." 538 U.S. at 428 (internal citation omitted). The Supreme Court noted that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S. at 425. All in all, the Supreme Court held in State Farm Mutual Automobile Insurance Co. v. Campbell:

> An application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.

538 U.S. at 429.

After the Supreme Court's holding in State Farm Mutual Automobile Insurance Co. v. Campbell, the Tenth Circuit affirmed an award with a ratio of twenty to one. See Haberman v. The Hartford Ins. Grp., 443 F.3d 1257, 1263 (10th Cir. 2006)(considering a $100,000.00 punitive

damage award with actual damages of $5,000.00). Noting the Supreme Court's admonition in State Farm Mutual Automobile Insurance Co. v. Campbell that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Tenth Circuit nonetheless affirmed the twenty to one ratio. Haberman v. The Hartford Ins. Grp., 443 F.3d at 1272. The Tenth Circuit found it persuasive, with the reprehensibility of the defendant's conduct, that the compensatory damages were relatively low. See 443 F.3d at 1272 ("We are not convinced that the low award of compensatory damages in this case cannot support the more than single digit ratio.").

      **c.**        **Exxon Shipping Co. v. Baker.**

Although the binding precedential value of the Supreme Court's most recent punitive damages decision in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008), is limited to maritime cases, see Exxon Shipping Co. v. Baker, 554 U.S. at 513, some commentators view the decision as signaling an intention to adopt a bright-line punitive to compensatory damages ratio of one to one in all cases, see, e.g., Joni Hersch & W. Kip Viscusi, Punitive Damages by Numbers: Exxon Shipping Co. v. Baker, 18 Sup. Ct. Econ. Rev. 259, 260 (2010)(stating that, "[g]iven the earlier statements by the Court in State Farm v. Campbell," and "the Court's reliance in Exxon Shipping Co. v. Baker on statistical analyses of punitive damages that are not specific to maritime cases, there is considerable likelihood that the 1:1 ceiling ultimately will have ramifications beyond maritime cases."); Michael L. Brooks, Uncharted Waters: The Supreme Court Plots the Course to a Constitutional Bright-Line Restriction on Punitive Awards in *Exxon Shipping Co. v. Baker*, 62 Okla. L. Rev. 497, 517-18 (Spring 2010)("[A]lthough the precise holding in Exxon may be narrow, the case is likely to have a substantial impact on the constitutional dimension of punitive damages."). But see Erwin Chemerinsky, A Narrow Ruling on Punitive Damages, Trial, Sept.

2008, at 62, 63 ("[T]he Court was clear that it was dealing only with punitive damages in maritime cases. At most, its reasoning can be applied to other areas of federal common law where punitive damages are allowed.").

Exxon Shipping Co. v. Baker was a lawsuit that commercial fishermen and native Alaskans brought for economic damages arising from the grounding of the supertanker Exxon Valdez on a reef off the Alaskan coast, which caused millions of gallons of crude oil to spill into Prince William Sound. See 554 U.S. at 476. After the United States Court of Appeals for the Ninth Circuit remitted the matter twice, the punitive damages award on appeal to the Supreme Court was $2.5 billion. See Exxon Shipping Co. v. Baker, 554 U.S. at 481. Total compensatory damages in the case were $507.5 million. See 554 U.S. at 515. The Supreme Court held that punitive damages in maritime cases should be limited to a one to one ratio. See 554 U.S. at 513. Although it did not decide Exxon Shipping Co. v. Baker on constitutional grounds, but rather pursuant to maritime law, the Supreme Court held: "In State Farm, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" Exxon Shipping Co. v. Baker, 554 U.S. at 514-15.

Justice Ginsburg appears to be among those who view Exxon Shipping Co. v. Baker as a sign of things to come in the Supreme Court's due-process jurisprudence. In her dissent, she wrote:

> In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"? On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

554 U.S. at 524 (Ginsburg, J., dissenting).

As constitutional scholar Erwin Chemerinsky has noted, the Supreme Court's "reasoning was less about maritime law and more about the need for predictable and consistent rules for punitive damages awards."  Chemerinsky, A Narrow Ruling on Punitive Damages at 62.  Along these lines, the Supreme Court expressly rejected the "verbal" approach to judicial review of punitive damages -- the approach taken in the Supreme Court's prior punitive damages jurisprudence -- in Exxon Shipping Co. v. Baker.  Exxon Shipping Co. v. Baker, 554 U.S. at 503-504.  After reviewing examples of state-law jury instructions on punitive damages, the Supreme Court noted:

> These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers. Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to  produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work.

554 U.S. at 504.  The Supreme Court found that, rather than imposing caps on punitive damages, "the more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum multiple."  554 U.S. at 506.  The Tenth Circuit has not expounded upon Exxon Shipping Co. v. Baker.

### 2. Determining the Constitutional Limits on Punitive Damages Awards.

Even in the context of a constitutional due-process analysis, the Supreme Court has recognized the value of "pegging punitive to compensatory damages using a ratio."  Exxon Shipping Co. v. Baker, 554 U.S. at 506.  See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23 (holding that, while "the punitive damages award in this case is more than 4 times the amount of

compensatory damages" and "may be close to the line," the award "does not cross the line into the area of constitutional impropriety"); BMW of N. Am., Inc. v. Gore, 517 U.S. at 580-81 (adopting as a "guidepost" the requirement that "exemplary damages must bear a 'reasonable relationship' to compensatory damages"). Indeed, the Supreme Court has held: "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425. Because the Supreme Court's reasoning in Exxon Shipping Co. v. Baker applies in cases outside the realm of maritime law, the Court will consider the reasoning, along with the guideposts identified in BMW of N. Am., Inc. v. Gore, mindful that the BMW of N. Am., Inc. v. Gore constitutional analysis controls the Court's analysis in non-maritime cases. Cf. Agostini v. Felton, 521 U.S. 203, 237 (1997)("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (citation omitted)).

        **a.**      **The First BMW of North America, Inc. v. Gore Guidepost: "Some Wrongs Are More Blameworthy Than Others."**

The reprehensibility of the Defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. The Supreme Court has set forth five characteristics of conduct that may be relevant to the reprehensibility guidepost: (i) whether the harm was physical versus economic; (ii) whether the

conduct evidences "an indifference to or reckless disregard of the health and safety of others"; (iii) the financial vulnerability of the target of the conduct; (iv) whether the conduct involved repeated action versus an isolated incident; and (v) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419. Under these factors, more reprehensible conduct, such as violence or the threat of violence, and "trickery and deceit," is considered more deserving of substantial punitive damage awards. BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. Where a plaintiff experiences purely economic harm, on the other hand, a substantial punitive damage award is less justified. See BMW of N. Am., Inc. v. Gore, 517 U.S. at 575. The Supreme Court has also noted, however, that "the infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." BMW of N. Am., Inc. v. Gore, 517 U.S. at 577. See Exxon Shipping Co. v. Baker, 554 U.S. at 494 (internal citations and quotations omitted)(recognizing that "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability"). Likewise, "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it), or when the value of the injury and the corresponding compensatory award are small (providing low incentives to sue)." Exxon Shipping Co. v. Baker, 554 U.S. at 494.

      **b.**     **The Second BMW of North America, Inc. v. Gore Guidepost: Punitive Damages Must Bear a Reasonable Relationship to Compensatory Damages.**

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." BMW of N. Am., Inc. v. Gore, 517 U.S. at 580. In the constitutional context -- as opposed to the maritime

context -- the Supreme Court has eschewed a mathematical formula.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 582 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula").  A punitive damages award of more than 500 times the compensatory damages, however, may be too great to pass constitutional muster.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 583 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis.  When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'" (internal citation omitted)).  Even before Exxon Shipping Co. v. Baker, absent exceptional circumstances, a ratio of greater than ten to one was likely to be deemed constitutionally excessive.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 581 (noting that the difference between punitive and actual damages in TXO Prod. Corp v. Alliance Res. Corp. "suggested that the relevant ratio was not more than 10 to 1").  Indeed, in most cases, the maximum ratio of punitive to compensatory damages permitted by the Due Process Clause appears to be nine to one.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").  At the same time as it appeared to uphold a nine-to-one ratio of punitive to compensatory damages generally, the Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell also noted that: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425.  Previously, the Supreme Court had affirmed a punitive damages award of "more than 4 times the amount of compensatory

damages," although it noted that this award "may be close to the line." Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23-24.

The Supreme Court noted several studies of punitive damage awards in Exxon Shipping Co. v. Baker, expressing its concern with "the stark unpredictability of punitive awards":

> Courts of law are concerned with fairness as consistency, and evidence that the median ratio of punitive to compensatory awards falls within a reasonable zone, or that punitive awards are infrequent, fails to tell us whether the spread between high and low individual awards is acceptable. The available data suggest it is not. A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but a mean ratio of 2.90:1 and a standard deviation of 13.81. Even to those of us unsophisticated in statistics, the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54. Other studies of some of the same data show that fully 14% of punitive awards in 2001 were greater than four times the compensatory damages, with 18% of punitives in the 1990s more than trebling the compensatory damages. And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages.

554 U.S. at 499-500 (citations omitted). Relying on empirical studies of punitive damages awards, the Supreme Court determined that the median ratio for all types of cases -- ranging from those with the least blameworthy conduct triggering punitive damages to those featuring malice -- is less than one to one. See 554 U.S at 512 ("These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . .").

### c. The Third BMW of North America, Inc. v. Gore Guidepost: Civil or Criminal Penalties in Comparable Cases Provide Notice of Potentially Significant Punitive Damages.

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." BMW of N. Am., Inc. v. Gore, 517 U.S. at 583. While "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," the Supreme Court has cautioned that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. at 428. Nonetheless, courts should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989)(O'Connor, J., concurring in part and dissenting in part).

### d. All Three BMW of North America, Inc. v. Gore Guideposts Need Not Be In Agreement.

Tenth Circuit decisions suggest that all three BMW of North America, Inc. v. Gore guideposts need not agree to support a finding that a punitive damages award is constitutionally excessive. For example, in both Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d at 641 and United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231, the Tenth Circuit found that, while the reprehensibility and ratio guideposts both supported their ultimate decision, the facts in those cases "d[id] not lend themselves to comparison with statutory penalties." Cont'l Trend Res., Inc. v. OXY USA Inc., 101 F.3d at 641. See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231 ("A finding of common law fraud does not lend itself to comparison with statutory penalties.").

### e. The Defendant's Wealth is Relevant to the Determination of Punitive Damages.

Beyond the BMW of North America, Inc. v. Gore factors, the Tenth Circuit also permits consideration of the defendant's wealth when determining whether the punitive damages awarded comport with the Due Process Clause. See Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641. On the one hand, the Tenth Circuit acknowledged that "the Supreme Court in BMW downplayed the defendant's wealth as a justification for increasing punitive damages." 101 F.3d at 641. On the other hand, however, the Tenth Circuit found that the Supreme Court "places in the constitutional calculus the question of the minimum level of penalty necessary to achieve the state's goal of deterrence." Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641.[30]

In Federal Deposit Insurance Corp. v. Hamilton, 122 F.3d 854 (10th Cir. 1997), the Tenth Circuit found that the wealth of the defendant in that case, NationsBank, "cut[] the other way," contrasted with the BMW of North America, Inc. v. Gore guideposts. 122 F.3d at 862. The defendant's conduct was not significantly reprehensible given that the injury was economic and that "it arises out of a contractual relationship where the parties can and should contractually protect themselves by providing for explicit remedies in the event of breach." Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862 (noting that, under these circumstances, "the permissible ratio

---

[30] Thus, the Court in Continental Trend Resources, Inc. v. OXY USA, Inc. quoted BMW of North America, Inc. v. Gore:

> "The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers."

101 F.3d at 641 (quoting quoted BMW of North America, Inc. v. Gore, 517 U.S. at 584-85).

of punitive damages to actual damages should be relatively modest").  Also, the Tenth Circuit

found that there were not "any civil or criminal penalties applicable to the conduct engaged in by

NationsBank," suggesting that "NationsBank was not on notice that its conduct could give rise to

substantial non-compensatory liability."  Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862.

Still, a punitive to compensatory ratio of six to one was permitted after remittitur, based, in part,

on the Tenth Circuit's consideration of the defendant's wealth:

> Although we have been cautioned that the size of the defendant should not
> ordinarily be a very significant factor, we have also concluded that it is not
> irrelevant either.  OXY, 101 F.3d at 641.  NationsBank is undeniably a large
> financial institution, and the $44,000 in fraud damages cannot be expected to serve
> as much of a deterrent to any future misconduct.  Hence, constitutionally, a higher
> ratio of punitive to actual damages is warranted here than would be the case if the
> base level of compensatory damages were a significantly higher figure relative to
> the size of the defendant.

Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862.  In Deters v. Equifax Credit Info. Servs.,

Inc., the Tenth Circuit stated:

> In assessing the reasonableness of the punitive damages award in the instant case,
> we must consider the purposes of such a remedy, namely to punish and deter.  In
> this respect, the wealth and size of the defendant are relevant considerations.  We
> agree with the district court that Equifax's gross operating revenue of $1.8 billion
> in 1996 could be considered in levying a substantial punitive damages award.

202 F.3d at 1233.

f. **Litigation Costs, Including Attorney's Fees, Are Appropriately Considered When Evaluating the Constitutionality of Punitive Damages Awards.**

The Tenth Circuit has also noted that "the costs of litigation in order to vindicate rights is

an appropriate element to consider in justifying a punitive damages award."  Cont'l Trend Res.,

Inc. v. v. OXY USA Inc., 101 F.3d at 642 (citing O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438,

1447 (10th Cir. 1987), cert. denied, 486 U.S. 1032 (1988)).  Thus, because there was evidence in

Continental Trend Resources, Inc. v. OXY USA Inc. that "OXY thought it could impose its corporate will on plaintiffs," and because the plaintiffs had to endure a three-week trial, a lengthy appellate process, and significant post-trial litigation, the Tenth Circuit felt it was appropriate to consider the likely legal costs in addition to the compensatory damages when evaluating whether the punitive damages award was excessive. 101 F.3d at 642 ("Nothing in BMW would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award.").

### NEW MEXICO LAW REGARDING PUNITIVE DAMAGES

"Punitive damages 'are not compensation for injury.'" Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d 594, 597 (quoting State v. Powell, 1992-NMCA-086, ¶ 13, 839 P.2d 139, 144). "Punitive damages do not measure a loss to the plaintiff, but rather punish the tortfeasor for wrongdoing and serve as a deterrent." Sanchez v. Clayton, 1994-NMSC-064, ¶ 11, 877 P.2d 567, 572. "Punitive damages may not be awarded unless there is an underlying award of compensation for damages." Gonzales v. Surgidev Corp., 1995-NMSC-047, ¶ 12, 899 P.2d at 597 (citing N.M. Rules Ann. 13-1827). "Punitive damages serve two important policy objectives under our state common law: to punish reprehensible conduct and to deter similar conduct in the future." Akins v. United Steel Workers of Am., AFL-CIO, CLC, Local 187, 2010-NMSC-031, ¶ 20, 237 P.3d 744, 749 (citing Bogle v. Summit Inv. Co., 2005-NMCA-024, ¶ 34, 107 P.3d 520, 531). "[T]he award of punitive damages requires a culpable mental state because such damages aim to punish and deter 'culpable conduct beyond that necessary to establish the underlying cause of action.'" Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d 1136, 1152 (quoting Walta v. Gallegos Law Firm, P.C., 2002-NMCA-015, ¶ 56, 40 P.3d 449, 461). "New Mexico recognizes that, although punitive damages are not normally

available for a breach of contract, a plaintiff may recover punitive damages when a defendant's breach was 'malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights.'" Anderson Living Tr. v. ConocoPhillips Co., 952 F. Supp. 2d 979, 1046 (D.N.M. 2013)(Browning, J.)(citing Romero v. Mervyn's, 1989-NMSC-081, ¶ 23, 784 P.2d 992, 998).

In determining punitive-damage awards, New Mexico courts apply a preponderance-of-the-evidence standard. See Jessen v. Nat'l Excess Ins., 1989-NMSC-040, ¶ 15, 776 P.2d 1244, 1247-48 (citing United Nuclear Corp. v. Allendale Mut. Ins., 1985-NMSC-090, ¶¶ 14, 89, 709 P.2d 649, 653, 666). "To be liable for punitive damages, a wrongdoer must have some culpable mental state and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 12, 881 P.2d at 14 (citations omitted)(citing McGinnis v. Honeywell, Inc., 1990-NMSC-043, ¶ 31, 791 P.2d 452, 460; Loucks v. Albuquerque Nat'l Bank, 1966-NMSC-176, ¶ 48, 418 P.2d 191, 199). Factors to be weighed in assessing punitive damages are the enormity and nature of the wrong, and any aggravating circumstances. See Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d 84, 87 (citing Sweitzer v. Sanchez, 1969-NMCA-055, ¶ 26, 456 P.2d 882, 886). Punitive damages may be imposed "when a party intentionally or knowingly commits wrongs," or "when a defendant is utterly indifferent to the plaintiff's rights, even if the defendant lacked actual knowledge that his or her conduct would violate those rights." Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152 (citing N.M. Rules Ann. 13-1827; Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d 115, 125-26). "Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights." Kennedy v. Dexter Consol. Schs., 2000-NMSC-025, ¶ 32, 10 P.3d at 125 (citing Torres v. El Paso

Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d 386, 397, <u>overruled on other grounds by</u> <u>Herrera v.</u> <u>Quality Pontiac</u>, 2003-NMSC-018, 73 P.3d 181). "Recklessness in the context of punitive damages refers to 'the intentional doing of an act with utter indifference to the consequences.'" <u>Torres v. El Paso Elec. Co.</u>, 1999-NMSC-029, ¶ 28, 987 P.2d at 397 (quoting N.M. Rules Ann. 13-1827). "The degree of the risk of danger involved in the activity in question is a relevant factor in determining whether particular conduct rises to the level of recklessness." <u>Torres v. El Paso</u> <u>Elec. Co.</u>, 1999-NMSC-029, ¶ 28, 987 P.2d at 397. "A defendant does not act with reckless disregard to a plaintiff's rights merely by failing 'to exercise even slight care,' absent the requisite 'culpable or evil state of mind.'" <u>Anderson Living Tr. v. ConocoPhillips Co.</u>, 952 F. Supp. 2d at 1031 (quoting <u>Paiz v. State Farm Fire & Cas. Co.</u>, 1994-NMSC-079, ¶ 26, 880 P.2d at 308). The Court has previously addressed punitive damages under New Mexico law in various situations. <u>See</u>, <u>e.g.</u>, <u>Rimbert v. Eli Lilly & Co.</u>, 577 F. Supp. 2d 1174, 1242 (D.N.M. 2008)(Browning, J.)(holding a genuine issue of material fact on punitive damages existed where a party had "demonstrated that persons at Eli Lilly may have been aware of a problem, perceived or actual, linking Prozac with increased suicidality and violence"); <u>Applied Capital, Inc. v. Gibson</u>, 558 F. Supp. 2d 1189, 1196 (D.N.M. 2007)(Browning, J.)(granting punitive damages where the defendant "intentionally deceived Applied Capital, misrepresenting Legato Staffing's financial resources and creditworthiness, the existence of the rig, and the bona fides of the transaction generally"); <u>Faniola v. Mazda Motor Corp.</u>, No. CIV 02-1011 JB/RLP, 2004 WL 1354469, at *1, *6 (D.N.M. April 30, 2004)(Browning, J.)(noting that "a reasonable factfinder could [not] find that Mazda had a culpable mental state in designing [a] fuel tank" when "Mazda's design was and is accepted in the industry" and the design met "federal safety standards," although the facts

showed that "[t]he brake shoe rotated under Faniola's vehicle, striking several places, and punctured her gas tank," causing the car to catch fire).

While the Supreme Court of New Mexico has not addressed punitive damages arising from automobile accidents, the Court of Appeals of New Mexico has upheld punitive damages awards when drivers used alcohol or drugs, drove while intoxicated and suffering from an extreme lack of sleep, and drove erratically or far beyond the speed limit. See DeMatteo v. Simon, 1991-NMCA-027, 812 P.2d 361; Svejcara v. Whitman, 1971-NMCA-093, 487 P.2d 167; Sanchez v. Wiley, 1997-NMCA-105, 946 P.2d 650. In Svejcara v. Whitman, the Court of Appeals of New Mexico upheld a jury's punitive damages award where:

> Defendant was driving in a reckless manner while intoxicated. He turned into slow moving on-coming traffic. He stated he was traveling three miles per hour and yet the force of his car's impact spun plaintiffs' car almost 90 degrees, blew out the left rear tire, bent the left rear wheel, ruptured the gas tank, and bent the left rear door and fender for a total damage exceeding $1,000.00. The collision caused both plaintiffs to receive personal injuries some of which are permanent and disabling.

1971-NMCA-093, ¶ 21, 487 P.2d at 170. The Court of Appeals of New Mexico likewise upheld a jury's award in DeMatteo v. Simon, wherein the party "drove three to four hours the day before the accident, slept about five hours in his car, remained awake for the next twenty hours immediately prior to the accident, and then consumed marijuana shortly before the accident allowed the jury to conclude that punitive damages were warranted." 1991-NMCA-027, ¶ 7, 812 P.2d at 364. In Sanchez v. Wiley, the Court of Appeals of New Mexico reversed a directed verdict for the defendant, because, as the defendant "appeared to be under the influence of alcohol immediately following the accident," a jury could reasonably award punitive damages. 1997-NMCA-105, ¶ 16, 946 P.2d at 655.

The Court predicts that the Supreme Court of New Mexico would agree with these Court of Appeals of New Mexico cases. See Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d at 1224-25. The Supreme Court of New Mexico has made clear that utter indifference is sufficient for awarding punitive damages, and the risks, even if not the certainty that a harm will occur, associated with excessive speed, erratic driving, and alcohol and drugs while driving are both known and high. See, e.g., Yedidag v. Roswell Clinic Corp., 2015-NMSC-012, ¶ 58, 346 P.3d at 1152; Torres v. El Paso Elec. Co., 1999-NMSC-029, ¶ 28, 987 P.2d at 397; Green Tree Acceptance, Inc. v. Layton, 1989-NMSC-006, ¶ 9, 769 P.2d at 87. Further, the Supreme Court of New Mexico considers a party's knowledge of and failure to follow state law when upholding punitive damages awards. See Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 21, 881 P.2d at 16 ("Ferrellgas employees testified that they knew of the state laws that required them to install a vapor barrier and to properly vent the trunk of the car when they installed the tank. . . . There is no question that they did not comply with these requirements."). In DeMatteo v. Simon, Svejcara v. Whitman, and Sanchez v. Wiley, the drivers using substances, speeding, and driving erratically egregiously violated well-established and understood driving rules and norms, which, like failing to follow the regulations for installing propane tanks, accompany "high risk[s] of harm." Clay v. Ferrellgas, Inc., 1994-NMSC-080, ¶ 24, 881 P.2d at 17.

## ANALYSIS

The Court does not have subject-matter jurisdiction over this case. The Amended Complaint, the Counterclaim, and the Third-Party Complaint do not contain any federal questions, and the parties are not diverse. The Court will not award attorney's fees to Prince, because, when the Defendants removed the case, the Original Complaint contained a Monell claim, and the Defendants therefore were objectively reasonable in removing the case. Accordingly, the Court

grants in part and denies in part the Motion to Remand. Because the Court lacks subject-matter

jurisdiction, the Court will leave the Counterclaims MTD and the Schindler MTD for the state

court to decide.

## I. THE AMENDED COMPLAINT, THE COUNTERCLAIM, AND THE THIRD-PARTY COMPLAINT LACK A FEDERAL QUESTION.

The Defendants filed the Notice of Removal after Prince filed the Original Complaint, but

before Prince filed the Amended Complaint. See Original Complaint at 1; Notice of Removal at 3;

Amended Complaint at 1. Although the Original Complaint contained a Monell claim for federal

constitutional violations, see Original Complaint ¶¶ 57-62, at 12, the Amended Complaint lacks

the Monell claim or any other federal claims, see Amended Complaint ¶¶ 45-91, at 8-16. To

prevent remanding the case, the Defendants must overcome the presumption against removal

jurisdiction. See Laughlin v. Kmart Corp., 50 F.3d at 873; Fajen v. Found. Reserve Ins. Co., 683

F.2d at 333; Martin v. Franklin Capital Corp., 251 F.3d at 1290; Bonadeo v. Lujan, 2009 WL

1324119, at *4. The defendant seeking removal must establish that federal court jurisdiction is

proper "by a preponderance of the evidence." McPhail v. Deere & Co., 529 F.3d at 953.

Furthermore, the Court held in Bonadeo v. Lujan that "[r]emoval statutes are strictly construed,

and ambiguities should be resolved in favor of remand." 2009 WL 1324119, at *4.

At the hearing, Prince stipulated that she "is presently not raising any federal claims, not

seeking any punitive damages as a result of violations of federal law, and that at the time this case

is being remanded, . . . she's not seeking any relief under federal law." Tr. at 18:19-19:1 (Court,

Carpenter). In contrast, the Defendants insist that "the Amended Complaint continues to assert

federal question claims." Remand Response at 2. The Defendants argue that Prince's claims of

negligent hiring, training, and supervision are Monell claims, and thus actionable under

42 U.S.C. § 1983.  See Remand Response at 3 (citing <u>Gallagher v. Shelton</u>, 587 F.3d at 1069). According to the Defendants, Prince's "supervisory and municipal liability claims must be addressed as federal constitutional questions."  Remand Response at 3-4 (citing <u>Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown</u>, 520 U.S. 397; <u>Dodds v. Richardson</u>, 614 F.3d 1185; <u>Barney v. Pulsipher</u>, 143 F.3d at 1307-08).

The Court concludes that Prince's negligent hiring, training, and supervision claim is not a federal claim.  The Amended Complaint's Count II alleges that the City of Deming, Orosco, and Mercado engaged in negligent hiring, training, supervision, and retention, but it does not mention or refer to any federal constitutional provision or law.  See Amended Complaint ¶¶ 52-56, at 11-12.  At the hearing, the Defendants asserted that respondeat superior under the New Mexico Tort Claims Act is "extremely limited," but they conceded that it exists.  Tr. at 13:6 (Lyle).  The New Mexico Tort Claims Act exempts public employees' immunity for some torts.  <u>See</u>, <u>e.g.</u>, N.M. Stat. Ann. §§ 41-4-6, -12.  As the Court held in <u>Williams v. Board of Regents of Univiversity of New Mexico</u>, 20 F. Supp. 3d 1177 (D.N.M. 2014)(Browning, J.), the New Mexico Tort Claims Act "'grant[s] governmental entities and employees a general immunity from tort liability, [and] waives that immunity in certain defined circumstances.'"  20 F. Supp. 3d at 1187 (quoting <u>Cobos v. Doña Ana Cty. Hous. Auth.</u>, 1998-NMSC-049, ¶ 6, 970 P.2d at 1145)(alterations added in <u>Williams v. Bd. of Regents of Univ. of N.M.</u>).  <u>See</u> <u>Davis v. N.M. Dep't of Game & Fish</u>, 1:18-cv-00415-LF-SCY, 2019 WL 943514, at *6 (D.N.M. Feb. 26, 2019)(Fashing, M.J.).  Moreover, the Supreme Court of New Mexico has added that "the doctrine of respondeat superior extends liability to the public entities that have supervisory control over the tortious actors."  <u>Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't</u>, 1996-NMSC-021, ¶ 14, 916 P.2d 1313, 1318.  The Supreme Court of New Mexico has explained:

> A governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived. . . . When the act of the employee is the act of the public entity, let the master answer. To the extent that prior cases have rejected the applicability of the tort doctrine of respondeat superior under the Tort Claims Act, . . . those cases are hereby overruled.

Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385 (citations omitted).

The Court concludes that the Amended Complaint lacks any Monell claims, and the Court does not construe the Amended Complaint's negligent hiring, training, and supervision claim as a Monell claim in disguise, because the New Mexico Tort Claims Act provides a more viable avenue for suing the City of Deming, Orosco, and Mercado for negligent hiring, training, and supervision than does § 1983. As noted above, the Tenth Circuit recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d at 1199). Thus, Prince's ability to state a federal claim under § 1983 against many of the Defendants on a theory of respondeat superior is much more limited than her ability to state a similar claim under the New Mexico Tort Claims Act. As Ashcroft v. Iqbal stated, "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit has held that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" that deprives the plaintiff of a constitutional or federal statutory right. Dodds v. Richardson, 614 F.3d at 1199. The Court concludes that Prince has not alleged sufficiently any constitutional violations or violations of federal statutory rights, and, even if there was such a violation, Prince has not alleged that the City of Deming, Orosco, and Mercado have implemented

any policy that is directly tied to a violation of any right such that a viable federal claim exists. See Dodds v. Richardson, 614 F.3d at 1200-01 (recognizing that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct'" (quoting Rizzo v. Goode, 423 U.S. at 371)). Accordingly, Prince's negligent hiring, training, and supervision claim does not afford an adequate basis for establishing subject-matter jurisdiction.

The Court also concludes that the Amended Complaint's request for punitive damages, see Amended Complaint ¶¶ 3, 51, 56, 68, 91, at 10, 12, 13, 16, is an insufficient basis for asserting subject-matter jurisdiction. The Supreme Court has held that "federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 312. The Supreme Court has noted, however, that "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313.

Although federal law allows punitive damages for 42 U.S.C. § 1983 claims, see Smith v. Wade, 461 U.S. 30, 56 (1983); Ysai v. Brown, No. CIV 13-0183, 2014 WL 936837, at *2 (D.N.M. Feb. 28, 2014)(Browning, J.), the Court agrees with the Defendants that the New Mexico Tort Claims Act generally precludes awards of punitive damages. See Brooks v. Bd. of Educ., Civ. No. 12-1249 MV/SMV, 2016 WL 8188562, at *17 (D.N.M. June 28, 2016)(Vázquez, J.). As the Supreme Court of New Mexico has held, the New Mexico Tort Claims Act contains an "express grant of immunity to the state from liability for punitive damages in an action for which immunity has been waived." Torrance Cty. Mental Health Program v. N.M. Health & Env't Dep't, 1992-NMSC-026, ¶ 16, 830 P.2d 145, 149. Specifically, N.M. Stat. Ann. § 41-4-19(D) states:

"No judgment against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act shall include an award for exemplary or punitive damages or for interest prior to judgment."  N.M. Stat. Ann. § 41-4-19(D).[31]  Nevertheless, that Prince requests punitive damages does not by itself implicate a substantial federal issue, and thus Prince's request for punitive damages -- to the extent that it is viable -- does not create federal-question jurisdiction.  See Fitzgerald v. New Mexico, No. 17-CV-00365-MCA-LF, 2018 WL 671183, at *4 (D.N.M. Jan. 31, 2018)(Armijo, J.)(denying that federal-question jurisdiction existed where the plaintiff sought punitive damages, even though punitive damages are not available under the New Mexico Tort Claims Act).  Moreover, Prince stipulated at the hearing that she is "not seeking any punitive damages as a result of violations of federal law."  Tr. at 18:19-19:1 (Court, Carpenter).

Although the Defendants argue that the "essence" of the Amended Complaint "is a deprivation of the decedent's right to liberty [] caused by the alleged wrongful death," Tr. at 12:21-23 (Lyle), the Amended Complaint does not explicitly invoke any provisions of the Constitution, see Amended Complaint ¶¶ 45-91, at 10-16, and Prince stipulated at the hearing that she is not alleging any constitutional violations, see Tr. at 18:19-19:1 (Court, Carpenter).  Prince may be

---

[31]The only exception of which the Court is aware is in N.M. Stat. Ann. § 41-4-4(C), which states:

> A governmental entity shall pay any award for punitive or exemplary damages awarded against a public employee under the substantive law of a jurisdiction other than New Mexico, including other states, territories and possessions and the United States of America, if the public employee was acting within the scope of his duty.

N.M. Stat. Ann. § 41-4-(C).  Prince has not informed the Court of any other exceptions to the New Mexico Tort Claims Act's prohibition on punitive damages.

wrong that she is entitled to punitive damages under state law, and the request may be a remnant from when she was seeking a <u>Monell</u> claim, but these possible errors do not mean that the Court has federal-question jurisdiction. <u>See</u> <u>Fitzgerald v. New Mexico</u>, 2018 WL 671183, at *4. Accordingly, the Court concludes that the Amended Complaint does not contain a <u>Monell</u> claim, seek punitive damages as a result of a federal law violation, or raise any other issues implicating federal law.

The Defendants' affirmative defenses and the issues that the Defendants raise in the Counterclaim and Third-Party Complaint do not establish subject-matter jurisdiction. The Defendants maintain that "the defenses to the Plaintiff's claims, the issues raised by the Counterclaim and Third-Party Complaint and Plaintiff's continuing assertion of federal claims require analysis and evaluation of the applicable federal law inherent in all of these issues." Remand Response at 5. As to the defenses, the Court has noted that "the well-pleaded complaint rule means that 'a case may <u>not</u> be removed to federal court on the basis of a federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.'" <u>Firebird Structures, LCC v. United Brotherhood of Carpenters and Joiners of Am., Local Union No. 1505</u>, 252 F. Supp. 3d 1132, 1150 (D.N.M. 2017)(Browning, J.)(quoting <u>Caterpillar Inc. v. Williams</u>, 482 U.S. at 393)(emphasis in <u>Caterpillar Inc. v. Williams</u>). <u>See</u> <u>Louisville & Nashville R.R. Co. v. Mottley</u>, 211 U.S. 149, 152 (1908)("[A] suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution."). Thus, under the well-pleaded complaint rule, any federal issues that the Defendants may raise in defense to Prince's claims, such as qualified immunity, do not create federal-question jurisdiction.

The issues that the Defendants raise in the Counterclaim and Third-Party Complaint also do not create federal-question jurisdiction. The Defendants argue that their Counterclaim and Third-Party Complaint "involves a patient's constitutional right to refuse medical treatment" and that the Supreme Court "has firmly established the constitutional nature of the right of privacy" and the "right to refuse medical treatment." Remand Response at 5 (citing Bowers v. Hardwick, 478 U.S. at 194-95; Roe v. Wade, 410 U.S. at 113). At the hearing, however, the Defendants confirmed that they are not attempting to raise any federal claims in their Counterclaim and Third-Party Complaint, which contains only a "pure breach of contract" claim. Tr. at 17:5-6 (Lyle). The Defendants argue that their defense raises a federal question, because taking D. Prince into custody or treating him against his will -- which Prince argues law enforcement and EMS personnel should have done -- would have violated D. Prince's federal constitutional rights. See 17:10-18 (Lyle, Court). According to the Defendants, "constitutionally they couldn't do anything more than they did" when they responded to Prince's 911 call. Tr. at 18:7-8 (Lyle).

The Court determines that there is no substantial, disputed federal question on the Amended Complaint's face. See Nicodemus v. Union Pac. Grp., 440 F.3d at 1232 ("It is by now axiomatic that 'federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum.'" (quoting Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 313). Under Grable & Sons Metal Products Inc. v. Darue Engineering & Manufacturing, if the plaintiff asserts a state law-created cause of action, then the Court has federal-question jurisdiction only if there is a substantial, actually disputed federal question on the face of the well-pleaded claim, the resolution of the federal question is necessary to adjudicate the claim, and federal jurisdiction would not disrupt any congressionally approved balance of federal and state judicial

responsibilities. See Shay v. RWC Consulting Grp., No. CIV 13-0140 JB/ACT, 2014 WL 3421068, at *33 (D.N.M. June 30, 2014)(Browning, J.)(citing Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg., 545 U.S. at 312; Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. at 149). Prince does not allege a privacy violation under the federal Constitution, nor does she allege that treating D. Prince against his will would have violated his right to refuse treatment, and such omitted issues are not essential to her claims. See Schmeling v. NORDAM, 97 F.3d 1336, 1345 n.2 (10th Cir. 1996). The Defendants' argument that federal-question jurisdiction exists, because treating D. Prince would have violated his constitutional right to refuse treatment, is not enough to establish federal-question jurisdiction. Federal-question jurisdiction derives "from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Franchise Tax Bd. of the State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal., 463 U.S. at 10 (quoting Taylor v. Anderson, 234 U.S. 74, 75-76 (1914)). The Defendants allege breach of contract and no federal claims in their Counterclaim and Third-Party Complaint, and their right-to-refuse-treatment argument that they raise as a defense does not provide a basis for removal. Accordingly, the Court concludes that federal-question jurisdiction does not exist and remands the case to the County of Luna, Sixth Judicial District, State of New Mexico.

II. **PRINCE IS NOT ENTITLED TO ATTORNEY'S FEES, BECAUSE IT WAS OBJECTIVELY REASONABLE FOR THE DEFENDANTS TO REMOVE THE CASE.**

The Court concludes that removal was objectively reasonable when the Defendants removed the case, because, at the time of removal, the complaint contained a Monell claim, which created federal-question jurisdiction. The Defendants filed the Notice of Removal before -- albeit on the same day as -- Prince filed the Amended Complaint, which omitted the Monell claim. See

Notice of Removal at 3; Amended Complaint at 1. In the Original Complaint, Prince's Count III was a "*Monell* claim against City of Deming, Police Chief Orosco and Fire Chief Mercado for constitutional violation." Original Complaint at 13 (emphasis and capitalization omitted). The Defendants filed the Notice of Removal six days after Prince sent the Defendants a copy of her initial pleadings. <u>Compare</u> Original Complaint at 1, <u>with</u> Notice of Removal at 3. Later, on the same day that the Defendants filed the Notice of Removal, Prince filed the Amended Complaint, which contains no <u>Monell</u> claims. <u>See</u> Amended Complaint ¶¶ 45-91, at 10-16. Thus, removal was timely. <u>See</u> 28 U.S.C. § 1446(a)(1) ("The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based.").

In her initial <u>Monell</u> claim, Prince alleged that "[i]t was the policy and/or custom of Defendants to implement directives that in and of themselves violated Federal and State law including but not limited to the Constitution." Original Complaint ¶ 59, at 13. At the time of removal, the Defendants predicated subject-matter jurisdiction on the contention that "[t]he Complaint asserts claims or rights arising under the Constitution of the United States." Notice of Removal ¶ 2, at 2. The Defendants contended that "[t]he Complaint is a civil action over which this Court has jurisdiction pursuant to 42 U.S.C. § 1983, and which is removable by defendants under the provisions of 28 U.S.C. § 1441, in that the claims or a portion of the claims arise under the Constitution of the United States." Notice of Removal ¶ 3, at 2. Prince notes that, after she filed the Amended Complaint removing the <u>Monell</u> claim, she requested that the Defendants withdraw their removal. <u>See</u> Remand Reply at 9. Prince says that the Defendants responded that they would withdraw the removal if Prince "reimbursed them $400.00 and waived their rights to

bring any federal claims in the future." Remand Reply at 10. Prince argues that the "Defendants lacked any reasonable basis to refuse to withdraw the removal and clearly understood that their removal was rendered moot upon the filing of Plaintiff's Amended Complaint." Remand Reply at 10. At the hearing, the Court noted that, in the briefings, Prince requests attorney's fees, because she believes that the Notice of Removal is defective, but now she is arguing that she "should get attorneys' fees because [the Defendants' counsel] didn't agree to a motion to remand." Tr. at 9:11-12 (Court).

Based on the Monell claim's presence in the Original Complaint, it was objectively reasonable for the Defendants to assume that Prince was asserting federal claims such that federal-question jurisdiction existed. Section 1447(c) permits the district court to "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). The Tenth Circuit has held that, "'[a]bsent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied.'" Garrett v. Cook, 652 F.3d at 1254 (quoting Porter Trust v. Rural Water Sewer & Solid Waste Mgmt. Dist. No. 1, 607 F.3d 1251, 1253 (10th Cir. 2010)). See Martin v. Franklin Capital Corp., 546 U.S. at 141 (same). In Monell, the Supreme Court held that

> a local government may not be sued under [42 U.S.C.] § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Monell, 436 U.S. at 694. As the Court has explained, § 1983 "authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights." Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F.

Supp. 3d 1245, 1262 (D.N.M. 2017)(Browning, J.)(emphasis added). Moreover, the Original Complaint alleged violations of "Federal and State law including but not limited to the Constitution." Original Complaint ¶ 59, at 13. The Defendants therefore were objectively reasonable in removing the case based on their sound belief that Prince was bringing claims that established federal-question jurisdiction. Where "'an objectively reasonable basis exists [for seeking removal], fees should be denied.'" Garrett v. Cook, 652 F.3d at 1254 (quoting Porter Trust v. Rural Water Sewer & Solid Waste Mgmt. Dist. No. 1, 607 F.3d at 1253). Accordingly, the Court denies the Plaintiffs' request for attorney's fees.

IT IS ORDERED that: (i) the Plaintiff's Motion to Remand and Request for Attorney's Fees, filed September 27, 2018 (Doc. 6), is granted in part and denied in part; (ii) the case is remanded to the County of Luna, Sixth Judicial District, State of New Mexico; (iii) Plaintiff Christina Prince is not entitled to attorney's fees; (iv) the Plaintiff's Motion to Dismiss Counterclaims and Third-Party Complaint for Failure to State Claim and Lack of Subject Matter Jurisdiction, filed October 10, 2018 (Doc. 11), is left for the Sixth Judicial District Court to decide; and (v) the Plaintiff's Motion to Dismiss Counterclaim and Third-Party Complaint [Doc. 36] of Defendant Kathleen A. Schindler, filed January 4, 2019 (Doc. 37), is left for the Sixth Judicial District Court to decide.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Frances Crockett Carpenter
Law Office of Frances Crockett
Albuquerque, New Mexico

  *Attorney for the Plaintiff*

James P. Lyle
Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

  *Attorney for the Defendants*